## Case No. 3,914.

### In re DILLON.

[7 Sawy. 561.] [1]

District Court, N. D. California. April 27, 1854.

CONSULS NOT AMENABLE TO SUBPOENA—SUBPOENA DUCES TECUM—OFFICIAL DOCUMENTS.

1. The provision of the constitution, which secures to the accused in criminal prosecutions the right to have compulsory process for obtaining witnesses in his favor, does not authorize the issuing of such process to ambassadors, who by public law or consuls, who by express treaty, are not amenable to the process of the courts.

[Cited in U. S. v. Trumbull, 48 Fed. 96.]

2. Where a subpoena duces tecum, directed to a consul of France, is prayed for, it is the duty of the court to require the party praying for it to show that the document is not an official paper, protected by law from examination and seizure.

S. W. Inge, U. S. Atty.

C. Temple Emmett, for Del Valle.

HOFFMAN, District Judge. In this case the counsel of Senor Del Valle, a defendant now on trial on an indictment found against him in this court, obtained a subpoena duces tecum, directed to M. Dillon, commanding him to appear in court and produce a document said to be in his possession, and deemed material for the defence of the accused. The subpoena was returned served, but no return was made to the subpoena by M. Dillon, stating his consular privileges or other exemption from the process of the court. The witness having failed to appear, an attachment to compel his appearance was moved for and obtained. On being brought into court, M. Dillon, who is the consul of France at this port, protested against the compulsory process which had been issued, and while he disavowed any disrespect to the court, he claimed the immunity from compulsory process, requiring him to appear as a witness, secured to the consuls of France and America, by the second article of the convention ratified April 1, 1853. He was informed by the court that it was ready to hear the question whether the provisions of the convention applied to the present case fully discussed; the argument was fixed for the succeeding day, and M. Dillon was discharged. The discussion that has since taken place, would perhaps more regularly have arisen on the return of the process, or on that of a rule to show cause why an attachment should not issue. The counsel of M. Dillon were invited, however, by the court, to argue the subject as fully as if on motion for an attachment; and the whole question has been ably and elaborately discussed by him as well as by the counsel for the defendant on the trial.

The question presented to the court is, whether it has the power, on the motion of the defendant, accused of a crime against the laws of the United States, to issue and enforce compulsory process to the consul of France, requiring him to appear in court and testify in behalf of the defendant, notwithstanding the provisions of the article of the convention, before cited. By the terms of that article, it is stipulated between the United States and France that their consuls shall never be compelled to appear in court as witnesses. They may, however, be invited to attend, and if unable to do so, the article provides, that they may be examined

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

orally at their houses, or their disposition taken. By the sixth amendment of the constitution of the United States, it is provided that the accused in all criminal prosecution shall enjoy the right to have compulsory process for obtaining witnesses in his favor. It is urged by the counsel for the accused that this right is sacred, and secured to him by the constitution of the United States, that it is comprehensive and without exception. and that neither by law nor treaty can he be deprived of the right of compelling the attendance of any person whose testimony may be material to his defence. It was admitted by the counsel of M. Dillon, that if the constitution secures to the accused this right in the present case. he can not be deprived of it by any treaty stipulation; and that if the court is called upon to choose between allowing a constitutional right to a prisoner and disregarding a treaty stipulation, or denying the constitutional right and respecting the treaty, its highest allegiance is due to the constitution, and the rights therein guarantied must be maintained.

The question then to be determined is: Is the treaty stipulation alluded to irreconcilably in conflict with the constitutional provision cited? In approaching the consideration of this question, it is impossible for the court not to be profoundly impressed with a sense of its importance—not merely abstractly, but on account of consequences its decision may involve. On the one hand, it is asked to deny the accused a right claimed to be secured under the fundamental law of the land. On the other, it is urged not merely to hold a law of congress void for unconstitutionality,—a duty at all times the most delicate and important an American court of justice is called upon to perform.—but to declare a solemn treaty stipulation. entered into between the United States and a foreign country, to the faithful observance of which the honor of the nation is pledged, inoperative and void, because those by whom it was made had no power to enter into such engagements. By the constitutional provision referred to, the accused has the right to compulsory process to obtain witnesses in his favor. Does, then, this provision extend to every person within our territory, whether or not he be an ambassador or other public minister, and whether or not he be, by treaty stipulation or express law, exempted from the duty of obedience to a subpoena? And can the court, on his disobeying the writ, compel his obedience by fine and imprisonment? If the accused, by virtue of the constitutional provision in this case, can compel the attendance of the consul of France, it seems necessarily to follow that the attendance of an ambassador could in like manner be enforced. The immunity afforded to, and personal inviolability of, ambassadors now universally recognized by the laws of nations, has been deemed one of the most striking instances of the advance of civilization and the progress of enlightened and liberal ideas. Though resident in a foreign country, they are, says Mr. Chancellor Kent, exempted absolutely from all allegiance and from all responsibility to the laws of the country to which they are deputed. 1 Kent, Comm. 45. Their persons have, by the consent of all nations, been deemed inviolable; nor can they, says the same high authority, be made amenable to the civil or criminal jurisdiction of the country. By fiction of law the ambassador is considered as if he were out of the territory, of the foreign power, and though he resides within the foreign state he is considered a member of his own country, retaining his original domicile, and the government he represents has exclusive cognizance of his conduct and control over his person. Id. 46. Does, then, the constitution of the United States, by the provision in favor of persons accused of crime, intend to subject these high functionaries to the process of the courts, and does it authorize and require the courts, in case of disobedience, to violate their persons and disregard immunities universally conceded to them by the laws of nations, by imprisoning them? If, as the received doctrine, the ambassador cannot, even in the case of a high crime committed by himself, be proceeded against, it is obvious that for a lesser offence of a contempt or disobedience to an order of a court, he would a fortiori not be amenable to the law. The only ground upon which the right of a court to compel the appearance of an ambassador by its process, and to punish him if he disobey it, can be placed, is that the constitution is, in this case, in conflict with and paramount to the laws of nations, and the immunity usually conceded to ambassadors is by the provision in favor of the accused in criminal cases taken away. But the privilege of ambassadors from arrest, under any circumstances, has been declared by congress by special legislation. By the twenty-fifth section of the act of congress of April 30, 1790 [1 Stat. 118], it is enacted that, "if any writ or process sued out of any of the courts of the United States, or of a particular state, or by any judge or justice therein respectively, whereby the person of an ambassador may be arrested or imprisoned, or his goods distrained, seized, or attached, such writ and process shall be deemed and adjudged to be utterly null and void to all intents, construction, and purposes whatever." Under this act it is apparent that no attachment can issue against an ambassador, whether to compel his appearance as a witness, or for any other purpose. But if the construction of the constitutional provision contended for by the accused be sound, this enactment must be disregarded, and the ambassador, like any other person, must be attached. It is clear that the framers of the enactment above cited had no idea that in exempting ambassadors from all process against their persons, they were depriving parties accused of a

right to compulsory process to obtain the attendance of witnesses, secured to them by the constitution. One of two things is evident: either that the constitutional provision has a less comprehensive operation than is claimed for it, or that this enactment, prohibiting any process for the arrest of an ambassador, in any case, is unconstitutional. The legislative interpretation of the constitutional provision is the more significant, as the framers of that act must have had their attention particularly directed to that provision, for by the twenty-ninth section the right of the accused to compel the attendance of his witnesses, is expressly declared, and placed upon a constitutional basis. If, then, the provision of the constitution does not authorize the courts to compel the attendance of ambassadors, because they are exempt from their jurisdiction on general principles of public law, a law which derives its authority from the supposed assent of all civilized nations, a like exception must exist in favor of other public agents, on whom a nation has expressly and by solemn treaty agreed to confer a similar exemption. What, then, is the operation and effect of the constitutional provision referred to? In determining this question, its nature and object, and the evil it was intended to remedy, must be considered.

By the ancient rules of the common law, the party accused in capital cases had no right to exculpate himself by the testimony of any witnesses. The injustice of so unreasonable and oppressive a rule induced the courts to relax it, and the practice was gradually introduced of examining witnesses for the accused, but not upon oath. Sir Edward Coke denounces this practice as tyrannical and unjust, and contended that in criminal cases the accused was entitled to have witnesses sworn for him. It is now in England, by statutes comparatively recent, provided that the accused shall in all cases have the right of having witnesses sworn for him as well as against him. I am not aware that he even yet, in that country, possesses the right to compulsory process to obtain their attendance. The analogous right of the accused to have the assistance of counsel, does not to this day, or did not very recently, exist in England in any criminal cases except indictments for treason. Such was the state of the common law when the provisions giving the accused the right to compulsory process to secure the attendances of his witnesses, and the right to have the assistance of counsel, were incorporated into the constitution. They were obviously intended to abrogate the harsh and tyrannical rules of the common law which have been referred to, and to place the accused in a position to make his defence and establish his innocence, by giving him rights in all respects similar and equal to those possessed by the government for establishing his guilt. If, then, the accused, by virtue of these provisions, enjoys rights equal to those of the prosecution, and stands, with respect to witnesses, on the same footing with the government, it would seem that the object of the constitution is accomplished. Such seems to have been the construction given by congress to this provision of the constitution. By section 29 of the crimes act of April 30, 1790, it is provided, "that every person accused or indicted under that act shall have the like process of the court where he shall be tried, to compel his witnesses to appear at his trial as is usually granted to compel witnesses to appear on the prosecution against them." The fact that this act passed by the first congress assembled under the constitution, most of whose members had been members of the convention which framed that instrument, gives to this legislative construction a more than ordinary importance. If, then, the object and effect of the constitutional provision were merely to give to the accused the right to such process as is usually granted to compel witnesses to appear on the side of the prosecution against them, it follows that if by general principles of the laws of nations, as in the case of an ambassador, or by positive treaty stipulations, as in the case of the consul of France, the person sought to be made a witness be beyond the process of the court, neither the accused nor the prosecution is entitled to process against him. The ambassador is, as we have seen, not amenable in any respect to the laws of the country to which he is sent. The consul is by a treaty, which is the supreme law, placed beyond the reach of the process of the court. The cases seem not distinguishable in principle; for in each the accused, as well as the prosecution, is unable to secure the attendance of the witness, because he is beyond the reach of the court. The hardship to the accused is in no respect greater than if the witness were in a district or in a foreign country into which the process of the court could not run.

From all the provisions of the consular convention, it is obvious that it was intended to clothe the consul with some, at least, of the privileges of ambassadors, and so far as compelling his attendance as a witness is concerned, to place him beyond the reach of the process of the courts. He is, therefore, out of the jurisdiction to the same extent and in the same manner as the ambassador, who is regarded, by a fiction of law, as retaining his domicile in his own country, and beyond the jurisdiction of the county in which he actually resides. It is urged that it was decided by Mr. Chief Justice Marshall, on Burr's trial, that the constitutional provision extends to all persons whatever. But in that case, the point to be determined by the chief justice, was whether the accused possessed the right to compulsory process to obtain the production, by the president of the United States, of papers in his possession, deemed material for the defence. Chief Justice Marshall held that the subpoena duces

tecum should issue; but in treating of the question whether it could issue to the president of the United States, the attention of the court was exclusively directed to the point whether by law the president was exempt from such process. The case of an ambassador, exempted by national law from amenability to all process, or of a consul. exempted by express treaty, was not before the court. "If an exception exists," says the chief justice, "to the general principle that all persons may be compelled to testify for the accused, it must be looked for in the law of evidence." Such an exception does exist in that law in favor of the king; but not. he decides, in favor of the president. If. however, by treaty stipulation, which is the supreme law, an exception exists in the case of an agent of a foreign government, expressly placing him beyond the reach of compulsory process, the chief justice nowhere intimates that in such a case the process could issue.

It is urged that if this exemption by treaty is recognized, whole classes of residents might be in like manner placed beyond the reach of the process, and the accused might be deprived in many cases of all means of making his defence. But it is admitted that, if the testimony of the witness cannot be received. or if from infamy or other reasons he is incompetent to testify, compulsory process cannot issue. The same evil apprehended in the hypothetical case, just mentioned, would arise were congress to declare a class of residents incompetent to testify; and that they have the power to do so as far as relates to proceedings in the federal courts is undeniable. But it seems to me that the accused cannot justly complain of any hardship. He has allowed to him compulsory process to obtain the attendance of all persons within the jurisdiction, and amenable to the process of the court. If any person whose attendance he desires is not subject to the process of the court. and quoad hoc. out of the jurisdiction, the accused is in the same position as if his witness had left the country. or were dead. or if, when placed on the stand. he had availed himself of his privilege of not criminating himself, or other similar right, and thus withheld testimony of importance.

On a careful consideration of the whole subject. I have come to the conclusion that this court has no power to issue process to compel the attendance of the consul of France in this case. But, on another ground, it is clear to me that this court ought not to compel obedience to the subpoena in this case. The writ issued was a subpoena duces tecum. commanding M. Dillon to produce in court a certain document. said to be in his possession. It has not been disputed that the right of the accused, under the constitution. to obtain a subpoena duces tecum, rests on the same ground as his right to process to compel the attendance of witnesses to testify orally in his favor. The very letter of the constitution embraces, it is true. only the latter case, but it is declared by Mr. Chief Justice Marshall (1 Burr's Trial, p. 173 [Case No. 14,693]), "that the constitutional and legal right of an accused to obtain process to compel the attendance of his witnesses, extends to their bringing with them such papers as may be material for the defence." "The literal distinction," observes the chief justice, "which exists between the cases, is too much attenuated to be countenanced in the tribunals of a just and humane nation." But in determining, in the first instance, whether the subpoena to produce the required document shall issue, or, as in this case, the subpoena having issued, in deciding whether the witness shall be compelled to produce it, the court is required to exercise a discretion. "Not," says Mr. Chief Justice Marshall, "that an overstrained rigor should be used with respect to his right to apply for papers deemed by him to be material, but in order to see that the papers in question are relevant to the case, and such as could be introduced into the defence." It was for these reasons that the court, on the argument, required the defendant to disclose by affidavit the nature of the document he sought to have produced. That affidavit the counsel for the defendant have declined to furnish. The court is therefore wholly uninformed whether the document is such as could be received in evidence if produced, or whether it is of such a character as that the court ought to compel its production. If the document be wholly irrelevant or inadmissible in testimony, it is clear. from the observations of Mr. Chief Justice Marshall, that the court will not compel its production. And if, as there is reason to suppose, it is one of the official documents of the French consulate, by the very terms of the treaty its production cannot be compelled. From the tenor of Mr. Chief Justice Marshall's observations on Burr's trial, it is apparent that the right of the accused to compel the production of a document, is not coextensive with his right to compel the attendance of a witness to testify orally. In considering the nature of the discretion the court will exercise in awarding a subpoena duces tecum, he observes: "If it be apparent that for state reasons the papers cannot be introduced into the defence, the subpoena will not issue." And he afterwards says, "that there may be matter, the production of which the court will not require, is certain." It seems, then, from the observations of the chief justice, that though a subpoena may go even to the president of the United States, to obtain his testimony, the accused does not enjoy a coextensive right to obtain the production of any paper he may require for his defence. Whatever hardship to the accused this rule may occasionally work. the evil does not seem greater than arises in ordinary cases

·where a witness on a stand is · excused for special reasons from testifying the . facts .within his knowledge, no matter how important to the prisoner the evidence of those ;facts may be.

By the third article of the consular convention between the United States and France, it is stipulated that the authorities shall in no case examine or seize the papers deposited in consular offices. If a court can compel their production, it is obvious that the protection intended to be given, is gone. If, then, the court will not require the production of papers which, for state reasons, ,ought not to be produced, it would seem that in a case like the present, an indictment for a misdemeanor, it will not, even if it has .the power, violate the immunity and disregard the privileges secured by treaty to the agents of a foreign government. In a capital case, that the accused ·ought, in some form. says Mr. Chief Justice Marshall, to have the benefit of papers which the court will not require the production of, is a position which the court would very reluctantly deny. What ought to be done under such circumstances, presents. he observes, a delicate question. But he does not intimate that in a case of misdemeanor, papers which by the supreme law cannot be siezed or examined, shall be required to be produced. The most obvious course in such a case, is to admit secondary evidence of their contents. If the accused is unable to furnish such evidence, he is in no worse position than the ordinary case where accident or misfortune has put out of his reach material testimony. I think it clear, therefore, that in a case like the present, where the party subpoenaed is the consul of France, who is required to produce a document in his possession, it is not only the right, but the duty, of the court to require the defendant to show that the document is not an official paper protected by law from examination and seizure, and that on the failure of the accused to furnish the required information, the subpoena duces tecum will not be allowed, or, if issued, will not be enforced. I therefore think that, on this ground alone, compulsory process ought to be refused.