UNITED STATES *v.* TRUMBULL *et al.*

(*District Court, S. D. California.* October 23, 1891.)

1. FOREIGN CONSULS—EFFECT OF REVOLUTION—DUTY OF COURTS.
   A vice-consul of a foreign nation, who possesses an unrevoked *exequatur* issued by the president of the United States, must still be recognized by the courts as the accredited representative of his country, entitled to all the privileges appertaining to that office, notwithstanding that the government which sent him has been overthrown, and an apparently successful revolutionary government established in its place.

2. SAME—RIGHTS AND PRIVILEGES—EXEMPTION FROM SUBPŒNA AS WITNESS—VIOLATION OF NEUTRALITY LAWS.
   In a prosecution against private individuals for violating the neutrality laws of the United States by fitting out a warlike vessel to aid a rebellion against a foreign power, the vice-consul of that power cannot be compelled by legal process to attend as a witness in behalf of the United States, when it appears that the insurgent party has been successful, and the government established by it has been recognized by the United States.

At Law. Indictment of Ricardo Trumbull and G. A. Burt for violation of neutrality laws. On motion of Walter D. Catton to be discharged from process of subpœna.

*W. Cole*, U. S. Atty., *Alexander Campbell* and *A. W. Hutton*, Special Asst. U. S. Attys.

*William Craig*, for the Vice-Consul.

Ross, J. It is greatly to be regretted that the important question now presented to the court must be disposed of in the haste of a *nisi prius* trial. The question arises in a case in which the government of the United States, by various counts in the indictment, charges, in effect, that on the 9th day of May, 1891, at a certain designated place within this judicial district, Ricardo Trumbull and G. A. Burt attempted to fit out and arm, fitted out and armed, caused to be fitted out and armed, and were knowingly concerned in fitting out and arming, a certain steamship called the "Itata," which was then and there in the possession and under the control of certain citizens of the republic of Chili, known as the "Congressional Party," and who were then and there, in said republic,

organized and banded together in great numbers in armed rebellion and attempted revolution, and carrying on war against the republic of Chili and the government thereof, with which the United States then, and at the time of the finding of the indictment, were at peace, with intent that said ship should be employed in the service of the aforesaid Congressional party, to cruise or commit hostilities against the then established and recognized government of Chili, with which this government then was at peace; contrary to the provisions of section 5283 of the Revised Statutes of the United States. A similar violation of sections 5285 and 5286 of the Revised Statutes is also alleged. Counsel for the United States having caused a subpœna to be served upon Mr. Walter D. Catton to appear as a witness in the case on the part of the prosecution, he has appeared in obedience to the subpœna, and presented to the court his *exequatur*, issued by President Cleveland on the 26th of January, 1888, by which he was recognized by the executive as the duly-appointed vice-consul of Chili at San Francisco, Cal., and declared "free to exercise and enjoy such functions, powers, and privileges as are allowed to the vice-consuls of the most favored nations in the United States." He also presents the consular instructions received from his own government, which, among other things, prohibit consuls, without authorization from the minister of foreign affairs or the respective legations, if there be such, from making public the correspondence which they may hold with the government, or from giving publicity to information or *data* which they may receive while exercising their charge; and by which they are required to demand the privileges and exemptions which may appertain to them by virtue of treaties or conventions entered into between Chili and the nation where they may be stationed, and, in case there be no treaty, to demand the privileges and exemptions which are generally conceded in the country of their residence to consuls of other nations; and, as essential to the exercise of their office, they are required to demand inviolability of their archives and documents, and freedom in their acts performed in their capacity of consuls. For a violation of their instructions certain punishments are prescribed. Presenting the credentials and instructions mentioned, Mr. Catton asks to be relieved from further attendance upon the court as a witness. He bases the demand—*First*, upon the broad ground that his privileges as vice-consul exempt him from compulsory process to attend as a witness in any court of the United States; and, *secondly*, upon the ground that the circumstances of the present case are such as render it improper to require him to attend as a witness on the part of the prosecution.

The counsel for the United States deny that the privileges thus asserted by Mr. Catton exist; contending, in the first place, that he ceased to be vice-consul of Chili upon the overthrow of the government by which he was accredited. If the position of the counsel for the United States in this respect is correct, the question is of course ended, and Mr. Catton occupies the position of an ordinary witness subpœnaed in the cause. But I am unable to take that view of the matter. The court cannot say that the person who holds the unrevoked *exequatur* issued by

the president, by virtue of which he is in discharge of the duties of vice-consul of his country, is in fact not such officer.    The recognition of representatives of foreign countries is a matter for the executive depart-ment of the government, whose action in the premises is accepted and followed by the judicial department.    Whart. Int. Law Dig. p. 552.

But, accepting Mr. Catton as the duly authorized and acting vice-consul of the Chilian government, does his position as such, of itself, entitle him to exemption from compulsory process to attend as a witness in the courts of the United States?    It is very clear that by the law of nations consuls and vice-consuls stand upon a very different footing from ambassadors and ministers.    The latter are not amenable to either the civil or criminal jurisdiction of the country to which they are dep-uted; not so, however, the former.    1 Whart. Int. Law Dig. pp. 767, 775, 776; Wools. Int. Law, p. 162; 1 Kent, Comm. 45, 46.    But it is contended that such immunity attaches to the vice-consul of Chili by reason of the treaty concluded between the United States and that coun-try on the 29th of April, 1832.    The first subdivision of article 31 of that treaty provided that it should—

"Remain in full force and virtue for the term of twelve years, to be reck-oned from the day of exchange of the ratification; and, further, until the end of one year after either of the contracting parties shall have given notice to the other of its intention to terminate the same, each of the contracting par-ties reserving to itself the right of giving such notice to the other at the end of said term of twelve years.    And it is hereby agreed between them that, on the expiration of one year after such notice shall have been received by either from the other party, this treaty in all the parts relating to commerce and navigation shall altogether cease and determine, and in all those parts which relate to peace and friendship it shall be permanently and perpetually bind-ing on both parties."

Pursuant to notice by the Chilian government under the foregoing article, the treaty, together with the explanatory convention which fol-lowed it in 1833, were terminated January 20, 1850.    Treat. & Conven. p. 118.    As will be observed, the portions of the treaty so terminated were those relating to commerce and navigation, leaving permanently and perpetually binding on both powers those parts relating to peace and friendship, embracing, as is contended, article 25 of the treaty, which is as follows:

"Both the contracting parties, being desirous of avoiding all inequality in relation to their public communications and official intercourse, have agreed, and do agree, to grant to their envoys, ministers, and other public agents the same favors, immunities, and exemptions which those of the most favored nations do or shall enjoy; it being understood that whatever favors, immu-nities, or privileges the United States of America or the republic of Chili may find it proper to give to the ministers and public agents of any other power shall, by the same act, be extended to those of each of the contracting parties."

It being stipulated by the convention between the United States and France, ratified April 1, 1853; that their consuls shall never be com-pelled to appear in court as witnesses, it is urged that the same privilege attaches to the consuls of Chili by virtue of article 25 of the treaty of 1832 above cited.    In the case of *In re Dillon,* 7 Sawy. 561, which arose

in 1854, it was held by the court that, because of the stipulation in the treaty between the United States and France to the effect that their consuls shall never be compelled to appear in court as witnesses, such consuls are not amenable to the compulsory process of the courts requiring their attendance, notwithstanding the provision of the constitution of the United States securing to the accused in criminal prosecutions the right to have compulsory process for obtaining witnesses in his favor. The subpœna served upon Mr. Dillon also required him to produce a certain document, said to be in his possession. Having failed to appear, an attachment was issued, and he was brought into court, from which, after a hearing of the matter, he was discharged. When the attachment was served, he hauled down his consular flag, and the case was taken up by the French minister at Washington as involving a gross disrespect to France. A long and animated controversy between Mr. Marcy, then secretary of state, and the French government ensued. The fact that an attachment had issued, under which Mr. Dillon was brought into court, was regarded by the French government as not merely a contravention of the treaty, but an offense by international law; and it was argued that the disrespect was not purged by the subsequent discharge of Mr. Dillon from arrest. It was urged, also, that the fact that the subpœna contained the clause *duces tecum* involved a violation of the consular archives. Mr. Marcy, in a letter of September 11, 1854, to Mr. Mason, then minister at Paris, discusses these questions at great length. He maintains that the provision in the federal constitution giving defendants opportunity to meet witnesses produced against them face to face overrides conflicting treaties, unless in cases where such treaties embody exceptions to this right recognized as such when the constitution was framed. One of these exceptions relates to the case of diplomatic representatives. "As the law of evidence stood when the constitution went into effect," says Mr. Marcy, "ambassadors and ministers could not be served with compulsory process to appear as witnesses, and the clause in the constitution referred to did not give the defendant the right in criminal prosecutions to compel their attendance in court." This privilege, however, Mr. Marcy maintained, did not extend to consuls; and consuls, therefore, could only procure the privilege when given to them by treaty, which, in criminal cases, was subject to the limitations of the constitution of the United States. Mr. Marcy, however, finding that the French government continued to regard the attachment with the subpœna *duces tecum* as an attack on its honor, offered, in a letter to Mr. Mason, dated January 18, 1855, to compromise the matter by a salute to the French flag upon a French man-of-war, stopping at San Francisco. Count de Santiges, the French minister at Washington, asked, in addition, that when the consular flag at San Francisco was rehoisted it should receive a salute. This was declined by Mr. Marcy. In August, 1855, after a long and protracted controversy, the French government agreed to accept as a sufficient satisfaction an expression of regret by the government of the United States, coupled with the provision that "when a French national ship or squadron shall appear in the harbor of San

Francisco the United States authorities there, military or naval, will salute the national flag borne by such ship or squadron with a national salute, at an hour to be specified and agreed on with the French naval commanding officer present, and the French ship or squadron whose flag is thus saluted will return the salute, gun for gun." Whart. Int. Dig. p. 666.

It will therefore be seen that while the court held, in *Dillon's Case*, that the provision of the constitution securing to the accused in criminal prosecutions the right to have compulsory process for obtaining witnesses in their favor does not authorize the issuing of such process to such consuls who, by express treaty, are not amenable to the process of the courts, the state department of the government contended that that provision overrides conflicting treaties, not embodying exceptions to the right guarantied, recognized as such when the constitution was framed, within which exceptions consuls did not come. In the present case, however, the provision of the constitution referred to in *Dillon's Case* is not involved; for Mr. Catton has not been subpœnaed as a witness for the defendants, but on behalf of the prosecution. And if he is entitled, as in effect it is declared he is, by article 25 of the convention of 1832, and by the *exequatur* issued to him by the president, to the same privileges and immunities as are granted to the consuls of France, it would seem to follow that he is exempt from compulsory process to attend the court as a witness.

But for another reason I do not think he should be compelled to attend as a witness in this cause. The offenses with which the defendants stand charged are violations of the neutrality laws of the United States, and consist in the giving of aid to those who now constitute the established and recognized government of Chili. Having succeeded and become recognized, the acts of that government from the commencement of its existence will be upheld as those of an independent nation. *Williams* v. *Bruffy*, 96 U. S. 176. To require the representative of that government to appear and give testimony against those alleged to have aided its establishment would not only be contrary to the principle upon which neutrality laws are based, but would strongly tend to give grave offense to the government now recognized by the United States, and with which this government, happily, is at peace. The motion on behalf of the vice-consul is allowed.