MONNOT *vs.* IBERT.

What is a sufficient demand and refusal of property, to authorize an action for the recovery of the possession thereof, on the ground of an unlawful detention by the defendant.

Although it is well settled that a chattel mortgage may be given to secure the mortgagee for future advances to be made to, and responsibilities incurred for, the benefit of the mortgagor, yet where a mortgage is given by a partnership, for that purpose, it cannot be made effectual to protect advances made to, or liabilities incurred for, their successors, after a dissolution of the firm.

If the debts and liabilities of the mortgagors, or the balance of account against them, which the mortgage was given to secure, are paid at any time, that satisfies and extinguishes the mortgage, and the security cannot receive fresh sustenance from dealings between the mortgagee and the firm which succeeds the mortgagors.

APPEAL by the defendant from a judgment recovered in the city court of Brooklyn.

*Mr. Hadden,* for the appellant.

*Mr. Silliman,* for the respondent.

*By the Court,* EMOTT, J. The plaintiff Monnot sued Ibert the defendant, in the city court of Brooklyn, to recover the possession of a horse and wagon. The title under which the plaintiff claimed the property was a chattel mortgage covering this and other property, made by Peter Scharnagle,

John G. Burkle and Frederick Burckmiller to Francis Monnot, on the 28th of February, 1856. The condition expressed in the mortgage was the payment by the mortgagors to Monnot of $3000, with interest, four months after its date. It was filed according to the statute, April 3d, 1856.

The defendant purchased the horse of the partners, Scharnagle & Co. in 1856; the wagon which is the subject of the action was sold some time in 1857 to one Wells, by a receiver appointed in a suit apparently to close the partnership, and by Wells it was sold to the defendant.

This action was brought for the unlawful detention of the property, and not upon any allegation of an unlawful taking, and it was therefore necessary for the plaintiff to prove a demand and refusal to deliver the property, in order to sustain the suit. The first question in the case arises upon a motion made for a nonsuit, on the ground that no demand and refusal was proved. The city judge erred in denying this motion. The only testimony upon this point was that of the plaintiff himself, who said that he told Ibert he was sorry he, Ibert, bought the horse and wagon, because they belonged to him under the mortgage; that he must have his money or take the horse and wagon; and he then adds that the defendant refused to let him have either. If this were all the evidence it might be explicit and distinct to prove a demand and a refusal. But the witness was cross-examined, and gave every thing which was said in that interview. The precise language stated to have been used by him was, " I shall have to take them from you, if I cannot get my money any other way." This expressed a purpose to make a demand in future, and that apparently only in a certain contingency, and not a plain and unequivocal request for the property, or its delivery there or then. This is the difficulty with the case; it is evidence of a demand as much as of a refusal, which is wanting. The answer of Ibert, as given by the witness in his cross-examination, was, " I don't care; I will give you the horse at any time, for Burkle is good for three such

horses." This was rather an expression of willingness to comply with a demand for the horse when it should be made, than a refusal to deliver the property. Still, nothing was said about the wagon, and if there had been a plain and immediate demand for their delivery, and after that both the horse and wagon had been detained in fact and not delivered, probably this language would hardly have been enough to qualify the refusal. It is true the authorities require that the refusal should be absolute, and not evasive. But this means that it should not be a mere excuse or apology for not complying immediately, as when the demand is made by an agent, and the other party wishes to verify his authority before complying, or of an agent who must consult his principal. If such excuses are made in good faith, they will not amount to a refusal for which trover will lie. There must be an absolute denial of the plaintiff's right, or the qualification or excuse must be unreasonable, or made in bad faith. (*Alexander* v. *Southey,* 5 *B.* & *Ald.* 247. 2 *Bulst.* 312. *Holbrook* v. *Wight,* 24 *Wend.* 169. 1 *Greenl. Ev.* § 644.) But the authorities also say that where no excuse is given, the refusal need not be express. If the demand is immediate and distinct, a silent retention of the goods will be sufficient. In *Davies* v. *Nicholas,* (7 *C.* & *P.* 339,) a demand in writing, left at the house and not complied with, was held sufficient. But in the present case the want of an explicit and immediate demand presents the application of these rules, and renders it necessary to consider how far the language used by the defendant would have qualified his not delivering the property specified.

One or two other points were argued, which it may be proper briefly to notice. The defendant claimed an estoppel against the plaintiff, to arise out of his acquiescence in the purchase of the horse by the former. The evidence, however, was not sufficiently distinct to show that the plaintiff was informed that the defendant was purchasing the particular horse now in controversy, to raise the question. All that

Monnot *v.* Ibert.

seems to have been shown was that the plaintiff was apprised that the defendant was purchasing a horse of Scharnagle & Co. Upon the effect of a consent or authority by the plaintiff to Scharnagle & Co. to sell the horse, the judge instructed the jury in accordance with the defendant's request.

The evidence disclosed the fact that the plaintiff's mortgage, although apparently and expressly given to secure a sum certain, was in fact made to secure him for future advances to be made and responsibilities incurred for the benefit of the mortgagors. The precise nature or extent of the agreement upon which the mortgage was given, and which was entirely verbal, is left somewhat in doubt, and there is some obscurity as to the liabilities or advances for which the plaintiff claims to hold it. It is well settled that a mortgage may be given to secure future advances and liabilities, and that it may be in the form of a security for the payment of a certain sum, leaving the true nature of the transaction to be shown by parol proof. Questions as to the rights of subsequent intervening incumbrances under such mortgages have, however, been much mooted. It is agreed in all the cases that such a mortgage will cover subsequent advances only to the amount specified in the condition, and of which therefore the registry gives notice. In *Brinkerhoff* v. *Marvin*, (5 *John. Ch.* 326,) Chancellor Kent expressed the opinion that where a subsequent judgment or mortgage intervened, farther advances after that period could not be covered. This certainly must be taken, as it probably was intended, with the qualification that the first mortgagee had notice in fact of the intervention of such subsequent incumbrance. In the *Bank of Utica* v. *Finch*, (3 *Barb. Ch.* 293,) Chancellor Walworth says that a mortgage may be taken as a general security for balances which may be due from time to time from the debtor, and that in the form of a mortgage sufficiently large to cover the amount of the floating debt intended to be secured thereby. There might be some discrepancy in the results to which these opinions would lead. A close examination of the two

cases will show that, in both, the opinions on these points were rather *obiter dicta*, and not necessary to the judgment given. The remark of Chancellor Kent, however, seems hardly sustained in its full extent by the subsequent authorities, and it seems also in conflict with Ld. Cowper's decision in a very early case. (*Gordon* v. *Graham*, 2 *Eq. Cas. Abr.* 598.) The opinion expressed by Chancellor Walworth, on the other hand, that a mortgage may be good against subsequent creditors, though taken to cover the final balance upon a running account of floating debt, presents a question which I think has not yet been fully considered or expressly decided. In *Truscott* v. *King*, (2 *Seld.* 147,) the question of the rights of mortgagees and subsequent creditors, under a security taken to protect the creditor for future advances, was fully considered in the court of appeals. In the opinion delivered by Judge Jewett, he treats the security there in question as given to secure advances and loans to be made after its creation, and not as intended expressly to secure a final balance, upon a continuing series of transactions. He remarks, at page 163, that the judgment in question in that case was given to secure to the creditors the payment of $20,000, on account of certain responsibilities which had been already or were shortly to be assumed, and which were so assumed for B. and S., the judgment debtors, by accepting drafts drawn on them. I infer that he considers that the judgment was given to secure the advances thus made, and not the balances against the debtors from time to time, made by the difference between the amount of acceptances made since the bond was given and the means provided from time to time for their payment, by the debtors. These latter acceptances are spoken of as being " *in addition to the acceptances and responsibilities to secure which the sum specified in the bond was designed.*" So, shortly after, Judge Jewett says that Williams & Co. received from the judgment debtors, between April, 1835, when the judgment was confessed, and October of that year, as much money as the drafts or acceptances out-

Monnot *v.* Ibert.

standing in April. "If so," he proceeds, "the judgment became satisfied, it having been given to indemnify against acceptances which Williams & Co. had made at or before the date of the bond, or which they made shortly thereafter; it could not serve the purpose of a security for a new indebtedness in addition to the debt of $20,000 for which it first stood as security." That certainly is a very plain proposition, but it puts the case, after all, rather upon the question of the actual agreement between the parties than upon its legal effect. In the present case the firm of Scharnagle & Co. for whose benefit the plaintiff was to assume the liabilities secured by this mortgage, was dissolved in August, 1856, by the retirement of one of the partners. I am unable to see how this security could be effectual to protect advances made or liabilities incurred in behalf of their successors. So the judge charged the jury; and yet, although they sustained the mortgage by their verdict, I find no evidence that any advance made to, or liability incurred for, the firm which was in existence when the security was made, was unpaid when this action was brought, or when the property in question was purchased by the defendant. If this were so, the verdict was unquestionably wrong, under the instruction which the jury actually received. The judge however refused to instruct the jury in one particular bearing upon this point, in which he was clearly wrong. The defendant's counsel asked the court to say to the jury, that if the indebtedness of the firm to Monnot, or his liability on their account existing at the time of the sale of the horse and notice of such sale to the plaintiff, was subsequently paid, the mortgage ceased to be a lien, and the sale was valid. Whether this mortgage was intended to secure a general balance or particular advances and liabilities, it must certainly be confined to the transactions between the original firm who made it and the plaintiff. If the debts and liabilities of that firm, or the balance of account against them which it was given to secure, were paid at any time, that satisfied and extinguished the mortgage, and it could not receive

fresh sustenance from dealings between the plaintiff and the firm which succeeded the mortgagors. It does not therefore become material to consider whether the mortgage was given to secure certain advances, or a floating balance; nor whether in the latter event it was invalid against purchasers, to any extent. Either way, the proposition to which I have just adverted was correct, and should have been stated to the jury. The verdict also seems to have been in conflict with the facts and with the instructions which were actually given to the jury.

The judgment must be reversed and a new trial ordered in the court below; the costs to abide the event.

[KINGS GENERAL TERM, December 12, 1859. *Lott, Emott* and *Brown,* Justices.]