### WILLIAMS *v.* BRUFFY.

1. The Confederate States was an illegal organization, within the provision of the Constitution of the United States prohibiting any treaty, alliance, or confederation of one State with another; whatever efficacy, therefore, its enactments possessed in any State entering into that organization must be attributed to the sanction given to them by that State.

2. Any enactment, from whatever source originating, to which a State gives the force of law, is a statute of the State, within the meaning of the act regulating the appellate jurisdiction of this court over the judgments and decrees of the State courts.

3. An enactment of the Confederate States, enforced as a law of one of the States composing that confederation, sequestrating a debt owing by one of its citizens to a citizen of a loyal State as an alien enemy, is void, because it impairs the obligation of the contract, and discriminates against citizens of another State. The constitutional provision prohibiting a State from passing a law impairing the obligation of contracts equally prohibits a State from enforcing as a law an enactment of that character, from whatever source originating.

4. When a rebellion becomes organized, and attains such proportions as to be able to put a formidable military force in the field, it is usual for the established government to concede to it some belligerent rights; but to what extent they shall be accorded to the insurgents depends upon the considerations of justice, humanity, and policy controlling the government.

5. The concession of belligerent rights to the Confederate government sanctioned no hostile legislation against the citizens of the loyal States.

6. Where property held by parties in the insurgent States, as trustees or bailees of loyal citizens, was forcibly taken from them, they may in some instances be released from liability, their release in such cases depending upon the same principles which control in ordinary cases of violence by an unlawful combination too powerful to be successfully resisted; but debts due such citizens, not being tangible things subject to seizure and removal, are not extinguished, by reason of the debtor's coerced payment of equivalent sums to an unlawful combination. They can only be satisfied when paid to the creditors to whom they are due, or to others by direction of lawful authority.

7. *De facto* governments of two kinds considered: (1.) Such as exists after it has expelled the regularly constituted authorities from the seats of power and the public offices, and established its own functionaries in their places, so as to represent in fact the sovereignty of the nation. As far as other nations are concerned, such a government is treated as in most respects possessing rightful authority; its contracts and treaties are usually enforced; its acquisitions are retained; its legislation is in general recognized; and the rights acquired under it are, with few exceptions, respected after the restoration of the authorities which were expelled. (2.) Such as exists where a portion of the inhabitants of a country have separated themselves from the parent State and established an independent government. The validity of its acts, both against the parent State and the citizens or subjects thereof, depends entirely upon its ultimate success; if it fail to establish itself permanently, all such acts perish with it; if it succeed and become recognized, its acts from the commencement of its existence are upheld as those of an independent nation.

8. The Confederate government was distinguished from each kind of such *de facto* governments. Whatever *de facto* character may be ascribed to it consists solely in the fact that for nearly four years it maintained a contest with the United States, and exercised dominion over a large extent of territory. Whilst it existed, it was simply the military representative of the insurrection against the authority of the United States; when its military forces were overthrown, it utterly perished, and with it all its enactments.

9. The legislative acts of the several States stand on different grounds; and, so far as they did not impair or tend to impair the supremacy of the national authority, or the just rights of citizens under the Constitution, they are, in general, to be treated as valid and binding.

Error to the Supreme Court of Appeals of the State of Virginia.

This was an action of assumpsit for certain goods sold by the plaintiffs in March, 1861, to George Bruffy, since deceased,

brought against the administrator of his estate in the Circuit Court of Rockingham County, Virginia. The plaintiffs at the time of the sale were and still are residents of the State of Pennsylvania; and the deceased was then, and until his death, which occurred during the war, continued to be, a resident of the State of Virginia.

The defendant pleaded the general issue, and two special pleas, in one of which he averred, in substance, that Pennsylvania was one of the United States, and that Virginia was one of the States which had formed a confederation known as the Confederate States; that from some time in 1861 until some time in 1865 the government of the United States was at war with the government of the Confederate States; that on the 30th of August, 1861, the Confederate States enacted a law sequestrating the lands, tenements, goods, chattels, rights, and credits within the Confederate States, and every right and interest therein, held by or for any alien enemy since the 21st of May, 1861, excepting such debts as may have been paid into the treasury of one of the Confederate States prior to the passage of the law, and making it the duty of every attorney, agent, former partner, trustee, or other person holding or controlling any such property or interest, to inform the receiver of the Confederate States of the fact, and to render an account thereof, and, so far as practicable, to place the same in the hands of the receiver, and declaring that thereafter such person should be acquitted of all responsibility for the property thus turned over, and that any person failing to give the information mentioned should be deemed guilty of a high misdemeanor; that on the 1st of January, 1862, this law being in force, the defendant's intestate paid over to the receiver of the Confederate States the amount claimed by the plaintiffs, and that by virtue of such payment he is discharged from the debt. The second special plea is substantially like the first, with the further averment that the debt due to the plaintiffs was sequestrated by the decree of a Confederate district court in Virginia, upon the petition of the receiver, who afterwards collected it with interest.

The plaintiffs demurred to these pleas; but the demurrers were overruled. The case was then submitted to the court

upon certain depositions and an agreed statement of facts. They established the sale and delivery of the goods, the residence of the plaintiffs and of the deceased during the war, and the payment by the latter of the debt in suit to the sequestrator of the Confederate government under a judgment of a Confederate district court. The court below gave judgment for the defendant; and the subsequent application of the plaintiffs to the Supreme Court of Appeals for a *supersedeas* was denied, that court being of opinion that the judgment was plainly right. Such a denial is deemed equivalent to an affirmance of the judgment, so far as to authorize a writ of error from this court to the Court of Appeals.

*Mr. Timothy O. Howe* and *Mr. Enoch Totten* for the plaintiffs in error.

1. In the decision in this cause there was drawn in question the validity of a statute of, or an authority exercised under, Virginia, on the ground that it was repugnant to the Constitution of the United States, and the decision was in favor of such validity. If she had not violated the Constitution by entering into an "agreement or compact" with other States, the debtor of the plaintiffs would not have been within the so-called Confederacy. The efficacy of the sequestration law, so far as it operated upon their rights and privileges, was imparted to it by Virginia, through her unlawful acts and combinations with other States.

2. The decision below was adverse to the title, right, privilege, and immunity under the Constitution of the United States, which the plaintiffs specially claimed.

The Constitution declares that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States;" and that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

As citizens of Pennsylvania, the plaintiffs, under these provisions, had a right to pass through or reside in Virginia; to take, hold, and dispose of property within her borders; to

institute and maintain actions in her courts, and to have the same rules of law enforced in the determination of them as would govern in suits between her citizens. *Corfield* v. *Coryell*, 4 Wash. 371; *Ward* v. *Maryland*, 12 Wall. 418. They were entitled to every privilege or immunity allowed to her most favored class of citizens. *Tenn.* v. *Ambrose*, 1 Meigs, 331; *Paul* v. *Virginia*, 8 Wall. 168; Slaughter-House Cases, 16 id. 75. The courts of Virginia, in a suit between her own citizens, could not have recognized as valid the defence set up below. This confiscation law which she enforced applies exclusively "to alien enemies," or, in other words, to citizens of the loyal States, and there can be no question that it impaired the obligation of this contract, and withheld from these plaintiffs the privileges and immunities to which they were undoubtedly entitled.

*Mr. Henry W. Garnett* and *Mr. Thomas J. Miller* for the defendant in error.

1. This court has no jurisdiction. No question arose touching the validity of a statute of any State, or of an authority exercised under it. " The Confederate States of America," so called, was an entirely different thing from the State of Virginia. Nor was there a decision against any title, right, privilege, or immunity, claimed under the Constitution, or any treaty, statute· of, or commission held or authority exercised under, the United States.

If, on other grounds, the judgment below impaired or failed to give effect to the contract sued on, there is no authority here to review it. *Knox* v. *Exchange Bank*, 12 Wall. 379.

2. The Confederate government was a government in fact, exercising supreme authority over the people of the States composing it, and its acts controlling their conduct must be their legal vindication. The accepted writers on public law establish these propositions.

(*a.*) That a *de facto* government, enjoying belligerent rights, has control over the territory it holds, and its laws are binding on all persons residing within its actual jurisdiction, in connection with all things situate there or owing to an alien enemy.

(*b.*) That the test of such *de facto* government is the num

ber of the population adhering to it; the armies it organizes in the field; the power it manifests in its resistance to the enemy; the facts recognized or repudiated by the enemy, such as interchanging prisoners of war, establishing blockades, &c.

We refer to the conclusions of law as contained in Wheaton's International Treatise, p. 23, Dana's note, on the recognition of belligerency. The Confederate government did comprehend, in its influence and authority, every thing constituting belligerency, and the *de facto* power entitling it to such rights as grow out of this condition of civil war. *Mauran* v. *Insurance Company*, 6 Wall. 1; *Thorington* v. *Smith*, 8 id. 1.

If the belligerent government enacts a law of confiscation or sequestration, and a debt is paid under its authority, the alien creditor can never hold the debtor to a second liability. The debt is extinguished just as if it had been paid to the creditor. *Ware* v. *Hylton*, 3 Dall. 227; Vattel, c. 3, pp. 8, 138, c. 9, sect. 161; *Brown* v. *United States*, 8 Cranch, 126, 129; Kent Com. 1, 59; Halleck, 365; Woolsey, 118.

The right of the government to confiscate and sequestrate does not depend upon its being *de jure*. If it be *de facto*, and possessed of belligerent rights, nothing more is required. It is not the party, but the individual, who lives within its territory; and he is relieved, because it was not possible for him legally to avoid the payment of the debt to a power which he could not resist. It has been deemed better for society that an alien enemy should lose his debt, than that his debtor should be made twice to pay what he once has paid, according to the established rules of war and of nations. The government *de facto* may fail to be a government *de jure*, but the individual who holds the property of another may rightfully surrender it at the demands and coercion of that government.

We respectfully refer to the elaborate argument of Mr. Green, in the case of *Keppel's Administrators* v. *Petersburg Railroad Co.* (Chase's Decisions, pp. 174–203), and to *Prize Cases* (2 Black, 635); *Thorington* v. *Smith*, supra, and to Vattel, p. 425; Wheaton, sect. 296; and to Halleck, on the rights of belligerents, and the authority of *de facto* governments.

Mr. Justice Field delivered the opinion of the court.

The question for our determination arises upon the special pleas, and relates to the sufficiency of the facts therein set forth as a defence; that is, to the effect of the sequestration of the debt by the Confederate government as a bar to the action.

There is, however, a preliminary question to be considered. It is contended by the defendant that the record presents no ground for the exercise of our appellate jurisdiction. The second section of the amendatory judiciary act of 1867, as given in the Revised Statutes, provides for a review by this court of the final judgment or decree of the highest court of a State in which a decision could be had, in three classes of cases.

1st, Where is drawn in question the validity of a treaty or statute of, or an authority exercised under, the United States, and the decision is against their validity.

2d, Where is drawn in question the validity of a statute of, or an authority exercised under, any State, on the ground of their being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favor of their validity; and,

3d, Where any title, right, privilege, or immunity is claimed under the Constitution, or any treaty or statute of, or commission held or authority exercised under, the United States, and the decision is against the title, right, privilege, or immunity specially set up or claimed by either party under such Constitution, treaty, statute, commission, or authority.

It is upon the last two clauses that the jurisdiction of the court is asserted by the plaintiffs; and we are of opinion that it can be maintained upon both of them. The pleas aver that a confederation was formed by Virginia and other States, called the Confederate States of America, and that under a law of this confederation, enforced in Virginia, the debt due to the plaintiffs was sequestrated. Now, the Constitution of the United States prohibits any treaty, alliance, or confederation by one State with another. The organization whose enactment is pleaded cannot, therefore, be regarded in this court as having any legal existence. It follows that whatever efficacy the enactment possessed in Virginia must be attributed to the sanction

given to it by that State. Any enactment, from whatever source originating, to which a State gives the force of law is a statute of the State, within the meaning of the clause cited relating to the jurisdiction of this court. It would be a narrow construction to limit the term to such enactments as have gone through various stages of consideration by the legislature. There may be many acts authorized by the constitution of a State, or by the convention that framed it, which have not been submitted to the consideration of its legislature, yet have all the efficacy of laws. By the only authority which can be recognized as having any legal existence, that is, the State of Virginia, this act of the unauthorized confederation was enforced as a law of the Commonwealth. Its validity was drawn in question on the ground that it was repugnant to the Constitution of the United States; and the decision of the court below was in favor of its validity. Its repugnancy was asserted in this, that it impaired the obligation of the contract between the plaintiffs and the deceased, and undertook to release the latter from liability, contrary to the express prohibition of that instrument; and also in this, that it discriminated against the plaintiffs as citizens of a loyal State, and refused to them the same privileges accorded to the citizens of Virginia, contrary to the provision declaring that " the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States." This provision has been held, in repeated adjudications of this court, to prohibit discriminating legislation by one State against the citizens of another State, and to secure to them the equal protection of its laws, and the same freedom possessed by its own citizens in the acquisition and enjoyment of property. *Corfield* v. *Coryell*, 4 Wash. C. C. 371; *Ward* v. *Maryland*, 12 Wall. 418; *Paul* v. *Virginia*, 8 id. 168. The enactment of the confederation which by the assent of Virginia was enforced as a law in that Commonwealth, and which is now invoked by the defendant, not only impaired, but attempted to destroy, the obligation of the contract of the deceased with the plaintiffs; and it discriminated against them as citizens of a State that maintained its allegiance to the Union. The demurrers to the special pleas raised these objections. The decision made involved the upholding of the Confederate enactment and

the denial of the immunity claimed by the plaintiffs. It could not have been made without passing upon both of these points. It is sufficient to give this court jurisdiction that, though not in terms specially stated in the pleadings, they were necessarily involved in the decision, and that without their consideration the judgment would not have been rendered. We have no doubt of our jurisdiction, and we proceed, therefore, to the merits of the case.

Treating the Confederate enactment as a law of the State which we can consider, there can be no doubt of its invalidity. The constitutional provision prohibiting a State from *passing* a law impairing the obligation of contracts, equally prohibits a State from *enforcing* as a law an enactment of that character, from whatever source originating. And the constitutional provision securing to the citizens of each State the privileges and immunities of citizens in the several States could not have a more fitting application than in condemning as utterly void the act under consideration here, which Virginia enforced as a law of that Commonwealth; treating the plaintiffs as alien enemies because of their loyalty to the Union, and decreeing for that reason a sequestration of debts due to them by its citizens.

The defendant, however, takes the ground that the enactment of the Confederate States is that of an independent nation, and must be so treated in this case. His contention is substantially this: that the Confederate government, from April, 1861, until it was overthrown in 1865, was a government *de facto*, complete in all its parts, exercising jurisdiction over a well-defined territory, which included that portion of Virginia where the deceased resided, and as such *de facto* government it engaged in war with the United States; and possessed, and was justified in exercising within its territorial limits, all the rights of war which belonged to an independent nation, and, among them, that of confiscating debts due by its citizens to its enemies.

In support of this position, reference is made to numerous instances of *de facto* governments which have existed in England and in other parts of Europe and in America; to the doctrines of jurists and writers on public law respecting the powers of such governments, and the validity accorded to their acts; to the opinion of this court in *Thorington* v. *Smith* and in

the *Prize Cases;* to the concession of belligerent rights to the Confederate government; and to the action of the States during our own revolutionary war and the period immediately following it.

We do not question the doctrines of public law which have been invoked, nor their application in proper cases; but it will be found, upon examination, that there is an essential difference between the government of the Confederate States and those *de facto* governments. The latter are of two kinds. One of them is such as exists after it has expelled the regularly constituted authorities from the seats of power and the public offices, and established its own functionaries in their places, so as to represent in fact the sovereignty of the nation. Such was the government of England under the Commonwealth established upon the execution of the king and the overthrow of the loyalists. As far as other nations are concerned, such a government is treated as in most respects possessing rightful authority; its contracts and treaties are usually enforced; its acquisitions are retained; its legislation is in general recognized; and the rights acquired under it are, with few exceptions, respected after the restoration of the authorities which were expelled. All that counsel say of *de facto* governments is justly said of a government of this kind. But the Confederate government was not of this kind. It never represented the nation, it never expelled the public authorities from the country, it never entered into any treaties, nor was it ever recognized as that of an independent power. It collected an immense military force, and temporarily expelled the authorities of the United States from the territory over which it exercised an usurped dominion: but in that expulsion the United States never acquiesced; on the contrary, they immediately resorted to similar force to regain possession of that territory and re-establish their authority, and they continued to use such force until they succeeded. It would be useless to comment upon the striking contrast between a government of this nature, which, with all its military strength, never had undisputed possession of power for a single day, and a government like that of the Commonwealth of England under Parliament or Cromwell.

The other kind of *de facto* governments, to which the doc-

trines cited relate, is such as exists where a portion of the inhabitants of a country have separated themselves from the parent State and established an independent government. The validity of its acts, both against the parent State and its citizens or subjects, depends entirely upon its ultimate success. If it fail to establish itself permanently, all such acts perish with it. If it succeed, and become recognized, its acts from the commencement of its existence are upheld as those of an independent nation. Such was the case of the State governments under the old confederation on their separation from the British crown. Having made good their declaration of independence, every thing they did from that date was as valid as if their independence had been at once acknowledged. Confiscations therefore, of enemy's property made by them were sustained as if made by an independent nation. But if they had failed in securing their independence, and the authority of the King had been re-established in this country, no one would contend that their acts against him, or his loyal subjects, could have been upheld as resting upon any legal foundation.

No case has been cited in argument, and we think none can be found, in which the acts of a portion of a State unsuccessfully attempting to establish a separate revolutionary government have been sustained as a matter of legal right. As justly observed by the late Chief Justice in *Shortridge & Co.* v. *Macon*, decided at the circuit, and, in all material respects, like the one at bar, "Those who engage in rebellion must consider the consequences. If they succeed, rebellion becomes revolution, and the new government will justify its founders. If they fail, all their acts hostile to the rightful government are violations of law, and originate no rights which can be recognized by the courts of the nation whose authority and existence have been alike assailed." Chase's Decisions, 136.

When a rebellion becomes organized, and attains such proportions as to be able to put a formidable military force in the field, it is usual for the established government to concede to it some belligerent rights. This concession is made in the interests of humanity, to prevent the cruelties which would inevitably follow mutual reprisals and retaliations. But belligerent rights, as the terms import, are rights which exist only during

war.; and to what extent they shall be accorded to insurgents depends upon the considerations of justice, humanity, and policy controlling the government. The rule stated by Vattel, that the justice of the cause between two enemies being by the law of nations reputed to be equal, whatsoever is permitted to the one in virtue of war is also permitted to the other, applies only to cases of regular war between independent nations. It has no application to the case of a war between an established government, and insurgents seeking to withdraw themselves from its jurisdiction or to overthrow its authority. Halleck's Inter. Law, c. 14, sect. 9. The concession made to the Confederate government in its military character was shown in the treatment of captives as prisoners of war, the exchange of prisoners, the recognition of flags of truce, the release of officers on parole, and other arrangements having a tendency to mitigate the evils of the contest. The concession placed its soldiers and military officers in its service on the footing of those engaged in lawful war, and exempted them from liability for acts of legitimate warfare. But it conferred no further immunity or any other rights. It in no respect condoned acts against the government not committed by armed force in the military service of the rebellious organization; it sanctioned no hostile legislation; it gave validity to no contracts for military stores; and it impaired in no respect the rights of loyal citizens as they had existed at the commencement of hostilities. Parties residing in the insurrectionary territory, having property in their possession as trustees or bailees of loyal citizens, may in some instances have had such property taken from them by force; and in that event they may perhaps be released from liability. Their release will depend upon the same principles which control in ordinary cases of violence by an unlawful combination too powerful to be successfully resisted.

But, debts not being tangible things subject to physical seizure and removal, the debtors cannot claim release from liability to their creditors by reason of the coerced payment of equivalent sums to an unlawful combination. The debts can only be satisfied when paid to the creditors to whom they are due, or to others by direction of lawful authority. Any sum which

the unlawful combination may have compelled the debtors to pay to its agents on account of debts to loyal citizens cannot have any effect upon their obligations: they remain subsisting and unimpaired. The concession of belligerent rights to the rebellious organization yielded nothing to its pretensions of legality. If it had succeeded in its contest, it would have protected the debtor from further claim for the debt; but, as it failed, the creditor may have recourse to the courts of the country as prior to the rebellion. It would be a strange thing if the nation, after succeeding in suppressing the rebellion and re-establishing its authority over the insurrectionary district, should, by any of its tribunals, recognize as valid the attempt of the rebellious organization to confiscate a debt due to a loyal citizen as a penalty for his loyalty. Such a thing would be unprecedented in the history of unsuccessful rebellions, and would rest upon no just principle.

The immense power exercised by the government of the Confederate States for nearly four years, the territory over which it extended, the vast resources it wielded, and the millions who acknowledged its authority, present an imposing spectacle well fitted to mislead the mind in considering the legal character of that organization. It claimed to represent an independent nation and to possess sovereign powers; and as such to displace the jurisdiction and authority of the United States from nearly half of their territory, and, instead of their laws, to substitute and enforce those of its own enactment. Its pretensions being resisted, they were submitted to the arbitrament of war. In that contest the Confederacy failed; and in its failure its pretensions were dissipated, its armies scattered, and the whole fabric of its government broken in pieces. The very property it had amassed passed to the nation. The United States, during the whole contest, never for one moment renounced their claim to supreme jurisdiction over the whole country, and to the allegiance of every citizen of the republic. They never acknowledged in any form, or through any of their departments, the lawfulness of the rebellious organization or the validity of any of its acts, except so far as such acknowledgment may have arisen from conceding to its armed forces in the conduct of the war the standing and rights of those

engaged in lawful warfare.   They never recognized its asserted power of rightful legislation.

There is nothing in the language used in *Thorington* v. *Smith* (8 Wall. 1) which conflicts with these views.   In that case, the Confederate government is characterized as one of paramount force, and classed among the governments of which the one maintained by Great Britain in Castine, from September, 1814, to the treaty of peace in 1815, and the one maintained by the United States in Tampico, during our war with Mexico, are examples.   Whilst the British retained possession of Castine, the inhabitants were held to be subject to such laws as the British government chose to recognize and impose.   Whilst the United States retained possession of Tampico, it was held that it must be regarded and respected as their territory.   The Confederate government, the court observed, differed from these temporary governments in the circumstance that its authority did not originate in lawful acts of regular war: but it was not, on that account, less actual or less supreme; and its supremacy, while not justifying acts of hostility to the United States, "made obedience to its authority in civil and local matters not only a necessity, but a duty."   All that was meant by this language was, that as the actual supremacy of the Confederate government existed over certain territory, individual resistance to its authority then would have been futile, and, therefore, unjustifiable.   In the face of an overwhelming force, obedience in such matters may often be a necessity, and, in the interests of order, a duty.   No concession is thus made to the rightfulness of the authority exercised.

Nor is there any thing in the decision of this court in the *Prize Cases* which militates against the views expressed.   It was there simply held, that when parties in rebellion had occupied and held in a hostile manner a portion of the territory of the country, declared their independence, cast off their allegiance, organized armies, and commenced hostilities against the government of the United States, war existed; that the President was bound to recognize the fact, and meet it without waiting for the action of Congress; that it was for him to determine what degree of force the crisis demanded, and whether the hostile forces were of such magnitude as to require him to

accord to them the character of belligerents; and that he had the right to institute a blockade of ports in their possession, which neutrals were bound to recognize.    It was also held, that as the rebellious parties had formed a confederacy, and thus become an organized body, and the territory dominated by them was defined; and the President had conceded to this organization in its military character belligerent rights, all the territory must be regarded as enemy's territory, and its inhabitants as enemies, whose property on the high seas would be lawful subjects of capture.    There is nothing in these doctrines which justified the Confederate States in claiming the *status* of foreign States during the war, or in treating the inhabitants of the loyal States as alien enemies.

Nor is there anything in the citations so often made from Wheaton and Vattel, as to the rights of contending parties in a civil war, which, if properly applied, militates against these views.    After stating that, according to Grotius, a civil war is public on the side of the established government, and private on the part of the people resisting its authority, Wheaton says: " But the general usage of nations regards such a war as entitling both the contending parties to all the rights of war as against each other, and even as respects neutral nations." Wheaton, Int. Law, sect. 296.    The writer is here referring to the consideration with which foreign nations treat a civil war in another country.    So far as they are concerned, the contending parties to such a war, once recognized as belligerents, are regarded as entitled to all the rights of war.    As between the belligerent parties, foreign nations, from general usage, are expected to observe a strict neutrality.    The language used has no reference to the rights which a sovereign must concede, or is expected to concede, to insurgents in armed rebellion against his authority.    Upon the doctrine stated in the citation the United States acted towards the contending parties in the civil war in South America.    In speaking on this subject, in the case of *The Santissima Trinidad* (7 Wheat. 283), this court said: " The government of the United States. has recognized the existence of a civil war between Spain and her colonies, and has avowed a determination to remain neutral between the parties, and to allow to each the same rights of

asylum and hospitality and intercourse. Each party is, there-
fore, deemed by us a belligerent nation, having, so far as concerns
us, the sovereign rights of war, and entitled to be respected in
the exercise of those rights.    We cannot interfere to the preju-
dice of either belligerent, without making ourselves a party to
the contest, and departing from the position of neutrality."

Vattel says: "A civil war breaks the bands of society and
government, or, at least, suspends their force and effect; it
produces in the nation two independent parties, who consider
each other as enemies, and acknowledge no common judge.
Those two parties, therefore, must necessarily be considered as
thenceforward constituting, at least for a time, two separate
bodies, two distinct societies. . . . . On earth they have no
common superior.    They stand, therefore, in precisely the
same predicament as two nations who engage in a contest, and,
being unable to come to an agreement, have recourse to arms.
This being the case, it is very evident that the common laws
of war — those maxims of humanity, moderation, and honor,
which we have already detailed in the course of this work —
ought to be observed by both parties in every civil war. For
the same reasons which render the observance of those maxims
a matter of obligation between State and State, it becomes
equally and even more necessary in the unhappy circumstance
of two incensed parties lacerating their common country."
Vattel, Law of Nations, p. 425.    All that Vattel means by
this language is, that in a civil war the contending parties have
a right to claim the enforcement of the same rules which
govern the conduct of armies in wars between independent
nations, — rules intended to mitigate the cruelties which would
attend mutual reprisals and retaliations    He has no reference
to the exercise of legislative power by either belligerent in
furtherance of its cause.    The validity of such legislation
depends not upon the existence of hostilities, but upon the ulti-
mate success of the party by which it is adopted.

It is unnecessary to pursue the subject further.    Whatever
*de facto* character may be ascribed to the Confederate govern-
ment consists solely in the fact, that it maintained a contest
with the United States for nearly four years, and dominated for
that period over a large extent of territory.    When its military

forces were overthrown, it utterly perished, and with it all its enactments, Whilst it existed, it was regarded, as said in *Thorington* v. *Smith*, "as simply the military representative of the insurrection against the authority of the United States." 8 Wall. 1; *Keppel's Adm'rs* v. *Petersburg Railroad Co.*, Chase's Decisions, 167.

Whilst thus holding that there was no validity in any legislation of the Confederate States which this court can recognize, it is proper to observe that the legislation of the States stands on very different grounds. The same general form of government, the same general laws for the administration of justice and the protection of private rights, which had existed in the States prior to the rebellion, remained during its continuance and afterwards. As far as the acts of the States did not impair, or tend to impair, the supremacy of the national authority, or the just rights of citizens under the Constitution, they are, in general, to be treated as valid and binding. As we said in *Horn* v. *Lockhart* (17 Wall. 570): "The existence of a state of insurrection and war did not loosen the bonds of society, or do away with civil government or the regular administration of the laws. Order was to be preserved, police regulations maintained, crime prosecuted, property protected, contracts enforced, marriages celebrated, estates settled, and the transfer and descent of property regulated, precisely as in time of peace. No one, that we are aware of, seriously questions the validity of judicial or legislative acts in the insurrectionary States touching these and kindred subjects, where they were not hostile in their purpose or mode of enforcement to the authority of the national government, and did not impair the rights of citizens under the Constitution." The same doctrine has been asserted in numerous other cases.

It follows from the views expressed that the State court erred in overruling the demurrers to the special pleas. Those demurrers should have been sustained, and the plaintiffs should have had judgment upon the agreed statement of facts for the amount of their claim, with interest from its maturity, deducting in the computation of time the period between the 27th of April, 1861, at which date the war is considered to have commenced in Virginia, and the 2d of April, 1866, when it is

deemed to have closed in that State.   *The Protector*, 12 Wall.
700; *Brown* v. *Hiatts*, 15 id. 177.

The action of the Court of Appeals of Virginia in refusing a
*supersedeas* of the judgment of the Circuit Court must, there-
fore, be reversed, and the cause remanded for further proceed-
ings in accordance with this opinion; and it is

*So ordered.*