## BANQUE DE FRANCE v. EQUITABLE TRUST CO. OF NEW YORK.

## SAME v. CHASE NAT. BANK OF CITY OF NEW YORK.

District Court, S. D. New York.  March 21, 1929.

Evarts, Choate, Sherman & Leon, George W. Wickersham, Joseph H. Choate, Jr., Maurice Leon, and Eugene J. Conroy, all of New York City, for plaintiff.

Rushmore, Bisbee & Stern, Murray, Aldrich & Roberts, George N. Hamlin, Winthrop W. Aldrich, and A. Donald Mackinnon, all of New York City, for Chase Nat. Bank and Equitable Trust Co.

GODDARD, District Judge. These motions are to strike out each of the seven separate defenses contained in the answers to amended complaints upon the ground that each of such defenses is insufficient in law, and to strike out from the denials what is alleged to be "the defense consisting of new matter * * * in so far as it is attempted by such new matter to set up the title of the State Bank of the Union of Soviet Socialist Republics."

There are two actions—one against the Chase National Bank of the City of New York, and one against the Equitable Trust Company of New York—each brought to recover gold of the value of $2,600,500. The pleadings in the actions are substantially similar, and the motions are addressed to the respective actions.

It is averred in the amended complaint that: "Before and at the commencement of this action the defendant had and it thereafter held said chattels in its possession in violation of plaintiff's rights as owner thereof, for the account of persons other than the plaintiff and without the plaintiff's consent; and that the possession of said chattels by the defendant was and remains wrongful, and defendant still detains the same from the plaintiff. * * *"

The answer denies the possession by the defendant of the gold, except the defendant "admits that before and at the commencement of this action, it had, and until on or about April 5, 1928, held, a shipment of what purported and was stated to be bars of gold received from the Garantie und Kreditbank fur den Osten, A. G. Hamburg, Germany, by order and for account of the State Bank of the Union Soviet Socialist Republics."

The answer also denies the making of any demand upon them by the plaintiff or any refusal by the defendants, except each defendant "admits that before the commencement of this action, and on or about March 6, 1928, it received a letter, copy of which is hereto annexed, made a part hereof, and marked 'Exhibit A' from the attorneys for the plaintiff in this action, demanding delivery of certain gold alleged to have been received by the defendant on or about February 21, 1928, from, or for account of the State Bank of the Soviet Union."

This letter, referred to as "Exhibit A," sets forth the grounds of plaintiff's alleged right to the gold:

"Pursuant to the instructions under which we are acting, we give you notice of the following facts:

"Beginning on or about January 14, 1915, and until July 11, 1917, the Bank of France purchased in the open market in Russia various quantities of gold aggregating at par the value of 52,246,988.77 gold francs, or $10,109.26. This gold the Bank of France thereupon entrusted for safekeeping to The State Bank of the Russian Empire at Petrograd, Russia, to be held for account of the Bank of France for delivery to it upon its demand. This gold upon its purchase became part of the metallic reserve of the Bank of France and has been carried as such ever since to this day. The Bank of France did not consent to the taking over of said gold by the State Bank of the Soviet Union and has duly and repeatedly demanded the return of the same nor has the Bank of France consented to the shipment of said gold to the United States, but since it is in your possession the Bank of France claims it as the true owner and entitled to the immediate possession of the same notwithstanding the fact that it may have been commingled with other gold and whether or not the said gold is the identical gold which was held by the State Bank of the Russian Empire prior to the delivery of said gold to the State Bank of the Soviet Union."

The answers set forth matter alleged by

way of separate defenses contained in seven separate defenses, several of which are based upon the plaintiff's alleged right to the gold as stated in said letter, Exhibit A.

First. That the gold in possession of the respective defendants is not plaintiff's property, but was the property of the State Bank of the Union Soviet Socialist Republics.

Second. That the shipment was received by the respective defendants as bailee for the account of the State Bank of the Union Soviet Socialist Republics, and that the respective demands upon them preliminary to the suit being instituted did not afford them a reasonable opportunity to investigate and determine the facts relative to the claim or ownership by the plaintiff, and that in any event the defendants, as bailee, had the right after demand to return and did return the gold to their respective bailors.

Third. That assuming the facts stated in the demand to be true, inasmuch as all gold, if any, of the plaintiff intrusted or delivered to the State Bank of the Russian Empire was confiscated under decrees of the Government of the Russian Socialist Federal Soviet Republic, it is now a part of the Union of Soviet Socialist Republics, which government has been recognized de jure by the Republic of France, of which the plaintiff is a citizen, such recognition validated the acts of the Union of Soviet Socialist Republics including the decrees of confiscation.

Fourth. That by the diplomatic correspondence between the Republic of France and the Union of Soviet Socialist Republics, all claims of the Republic of France and its nationals, including that of the plaintiff, became the exclusive subject of negotiation between the two governments and otherwise excluded the maintenance of any legal proceedings for the enforcement of the same.

Fifth. Assumes that the claim set forth in plaintiff's demand is true, and it sets forth facts which the respective defendants contend established the defense that the gold sought to be recovered is immune from judicial processes in this action.

Sixth. Assumes that the facts stated in plaintiff's demand are true, and avers facts which the respective defendants contend establish the defense that the determination of this action will involve an examination of the acts and decrees of each of said governments of Russia with respect to property located in its own territorial jurisdiction at the time of the making and enforcement of the said decrees.

Seventh. Assumes that the plaintiff's demand states the true facts; sets up as a defense that by reason of the recognition de jure accorded to the Union of Soviet Socialist Republics by the Republic of France, the plaintiff, a citizen and inhabitant of France, is not entitled by comity or otherwise to maintain these actions, for to permit it to do so would subject the defendants to the possibility of double liability.

In their denials of the allegations of the complaints, defendants expressly deny that the gold in question was part of or commingled with the gold claimed by plaintiff to have been intrusted by it to the State Bank of the Russian Empire, and in the allegations of the separate defenses, there is no such averment. Thus the ownership of the gold by plaintiff is denied, and in their separate defenses affirmatively allege that the gold was not the property of the plaintiff. The separate defenses contain no admission or averment that any gold was intrusted by the plaintiff to the State Bank of the Russian Empire, but do contain allegations of confiscation by the Soviet Government of all banks including the State Bank of the Russian Empire.

What is averred in the respective separate defenses is merely that whatever gold, if any, of the plaintiff was in possession of the State Bank of the Russian Empire was confiscated by the decrees of the Soviet Government and thus seized along with the gold in all other banks.

The first separate defense avers that the shipment to it "was not the property of the plaintiff, but is the sole and exclusive property of the State Bank of the Union Soviet Socialist Republics." Plaintiff urges that this defense is insufficient because it contends that the State Bank of the Union Soviet Socialist Republics is to be regarded as legally nonexistent, inasmuch as our government does not recognize the Union of Soviet Socialist Republics of which the bank is a part.

Under section 1093 of the Civil Practice Act (N. Y.), a defendant, "by answer, may defend on the ground that a third person was entitled to the chattel, without connecting himself with the latter's title."

Therefore, in so far as this motion to strike out the separate defense on the ground that it is insufficient is concerned, the averment that the shipment is not the property of the plaintiff, and therefore is the property of some one else, is to be regarded as admitted by the plaintiff whether its ownership is in the State Bank of the Union of Soviet Socialist Republics or not. If it be conceded that inasmuch as our government

has not recognized the Union of Soviet Socialist Republics, and that as the State Bank is a part of that government, there can be no ownership by the State Bank of the shipments; the averment that the shipments are not the property of the plaintiff still stands, for there is no admission nor allegation in the first separate defense, or in any other part of the answer, that the gold in question was ever a part of any gold that belonged to the plaintiff or had been deposited by it with the State Bank or had been mingled with gold which at any time belonged to the plaintiff. For instance, under this allegation, the defendants might prove that the gold had never been confiscated by the Union of Soviet Socialist Republics; that it had been mined or procured from other sources subsequent to the time any gold had been confiscated.

The separate defenses include allegations of the existence of a de facto government of the Union of Soviet Socialist Republics recognized de jure by many of the civilized nations of the world and existing to the exclusion of any previous government overthrown thereby.

This court should not assume that the Union of Soviet Socialist Republics acquired title to the gold in question by confiscation or in any manner inconsistent with our accepted standards. If there are any circumstances under which the Soviet Government might acquire title to property which would be recognized, then these defendants, American nationals, should be allowed an opportunity to show the circumstances relating to their source of title.

There is a distinction between the private rights and obligations of an individual and those of a body or a "paramount force" in control of the country wherein that individual resides and where the "paramount force" or government of that state is not recognized by our government. In Russian Reinsurance Co. v. Stoddard, 240 N. Y. 149, on page 158, 147 N. E. 703, 705, Judge Lehman stated: " * * * Until the State Department has recognized the new establishment, the Court may not pass upon its legitimacy or ascribe to its decrees all the effect which inheres in the laws or orders of a sovereign." However, he continues to state on page 158 of 240 N. Y. (147 N. E. 705): "It cannot determine how far the private rights and obligations of individuals are affected by acts of a body not sovereign or with which our Government will have no dealings. That question does not concern our foreign relations. It is not a political question, but a judicial question." See, also, Sokoloff v. National City Bank, 239 N. Y. 158, 145 N. E. 917, 37 A. L. R. 712.

That there is an existing government in Russia Sovereign within its own territory cannot be and is not entirely ignored even by our own country, although it has not recognized such government. For instance, in proceedings to naturalize Russian citizens, the executive and judicial branches of our own government acknowledge the existence of "the present Government of Russia" to the extent of requiring such applicants for citizenship to forswear allegiance to "the present Government of Russia." Russian Government v. Lehigh Valley R. Co. (D. C.) 293 F. 133, 135. See, also, article by Mr. Louis Connick of the Yale Law Journal, vol. 34, No. 5, p. 499. A marriage which is valid under the laws of the present government of Russia is quite universally regarded as valid in this country.

It was stated in Wulfsohn v. Russian, etc., Republic, 234 N. Y. 372, 138 N. E. 24, that except where the actual existence of a government created by rebellion or otherwise "becomes a political question affecting our neutrality laws, the recognition of the decrees of prize courts and similar questions, * * * the fact of the existence of such a Government whenever it becomes material may probably be proved in other ways" than by the determination of the State Department. See, also, James & Co. v. Second Russian Ins. Co., 239 N. Y. 248, 146 N. E. 369, 37 A. L. R. 720.

The Penza (D. C.) 277 F. 91; The Rogdai (D. C.) 278 F. 294, cited by the plaintiff as holding to the contrary, had to do with a situation where the Soviet Government sought to libel ships which were in the jurisdiction of the United States District Courts, and it was merely held that the Soviet Government, not having been recognized by our government, could not bring suit in our courts; and Judge Dietrich in Re The Rogdai, supra, in the opinion of the court, stated: "It will be noted that fundamentally there is no controversy touching the real ownership of the transport; she belongs to Russia; no adverse claim, either public or private, is involved. * * * It is to be reiterated that we are not here concerned with the claim of a third party, either public or private, to the property in controversy, nor have we a case where the Department of State has failed to act, or where it is sought only to protect a party in actual possession."

The courts in this country have not followed the decision of the English Court of

Appeal in Luther v. Sagor, 1921 L. R. 1 K. B. 456, 1921 L. R. 3 K. B. 532.

The Supreme Court in the Civil War cases sustained many acts relating to the creation of domestic corporations, the sale of property, and the payment of debts depending upon the validity of the decrees of the Confederate States. Laws necessary to the peace and good order of the country, such as sanctioning and protecting marriage, determining laws of descent, regulating the transfer of property, etc., were generally upheld. The decrees and laws of the Confederate States were recognized as valid by the Supreme Court unless public policy and justice required otherwise. See United States v. Rice, 4 Wheat. (17 U. S.) 246, 4 L. Ed. 563; United States v. Home Ins. Co., 22 Wall. (89 U. S.) 99, 22 L. Ed. 816; Thorington v. Smith, 8 Wall. (75 U. S.) 1, 19 L. Ed. 361; Dalmas v. Ins. Co., 14 Wall. (81 U. S.) 661, 20 L. Ed. 757; Texas v. White, 7 Wall. (74 U. S.) 700, 19 L. Ed. 227; Williams v. Bruffy, 96 U. S. 176, 24 L. Ed. 716; Baldy v. Hunter, 171 U. S. 388, 18 S. Ct. 890, 43 L. Ed. 208.

Later, came the views expressed by Judge Cardozo in Sokoloff v. National City Bank, supra, and there has now developed what I think will be generally regarded as the rule here. It holds to the principle that the refusal of the political department to recognize a government should not be allowed to affect private rights which may depend upon proving the existing conditions in such state. James & Co. v. Second Russian Ins. Co., supra; Russian Reinsurance Co. v. Stoddard, supra; Wulfsohn v. Russian Republic, supra.

Justice requires that effect should be given by our courts, even though we do not recognize the Russian Government, to those acts in Russia upon which the rights of our citizens depend, provided that in so doing our judicial department does not encroach upon or interfere with the political branch of our government. See "Legal Effects of Recognition in International Law," by John G. Hervey, chapter 7.

To deprive these defendants who are American nationals of asserting title to the gold which was shipped to them to be in the State Bank, and to preclude the defendants from showing in what manner such title was acquired, I believe would be doing violence to fundamental justice and would be contrary to the principles which the courts of this country apply. It is quite apparent that if the defendants are not permitted to do this, the probable result would be to sub-ject them to double liability, which the court in Russian Reinsurance Co. v. Stoddard, supra, rightly, in my opinion, held should be avoided.

In so far as the third and fourth defenses are concerned, the defendants set up the defense that if any of the plaintiff's gold was confiscated by the decree of the Soviet Socialist Republics, such acts became valid and binding on all citizens of France upon the recognition by France of the Union of Soviet Socialist Republics as the de jure Government of Russia, and that the plaintiff, a corporation organized under the laws of France, was therefore divested of its ownership to such property and cannot assert such ownership in this jurisdiction, even though the Union of Soviet Socialist Republics has not been recognized de facto or de jure by the United States Government; and that the plaintiff must look to its own Government of France to present this claim, if any, against the Russian Government in their respective negotiations.

By diplomatic communications exchanged between the French Government and the Union of Soviet Socialist Republics, recognition de jure was accorded to the Union of Soviet Socialist Republics by the Republic of France in October, 1924, and apparently the Government of France made all the claims of the Republic of France and its nationals the subject of negotiation between the two governments to the exclusion of legal proceedings for their enforcement. But if such claims as the plaintiff now urges were not expressly reserved for negotiation, and if the law applied by France to the rights of its citizens upon her recognition of the Union of Soviet Socialist Republics as the de jure Government of Russia does differ in effect from that given such recognition by the laws in the jurisdiction where this suit is brought, then the French law is a matter of proof. Latham v. De Loiselle, 3 App. Div. 525, 38 N. Y. S. 270, affirmed 158 N. Y. 687, 53 N. E. 1127, and cases therein cited.

It is settled law in this jurisdiction that recognition of a foreign government, either de jure or de facto, validates all acts of such foreign government from the time it existed. Williams v. Bruffy, supra; Oetgen v. Central Leather Co., 246 U. S. 297, 38 S. Ct. 309, 62 L. Ed. 726; Underhill v. Hernandez, 168 U. S. 250, 18 S. Ct. 83, 42 L. Ed. 456.

I think the position of the defendants is sound and supported by the authorities, and without discussing, but after consideration of, the cases cited in the briefs of the learned counsel for the plaintiff, which seem to

be distinguishable, I refer to the following as supporting this view:

Mr. Moore, in his Digest on International Law, volume 6, § 970, states: "A citizen of one nation wronged by conduct of another nation must seek redress through his own government. His government must assume responsibility of presenting his claim or it need not be considered."

See, also, United States v. Diekelman, 92 U. S. 520, at page 524 (23 L. Ed. 742), in which the Supreme Court stated: "Hence, a citizen of one nation wronged by the conduct of another nation, must seek redress through his own government. His sovereign must assume the responsibility of presenting his claim, or it need not be considered. If this responsibility is assumed, the claim may be prosecuted as one nation proceeds against another, not by suit in the courts, as of right, but by diplomacy, or, if need be, by war. It rests with the sovereign against whom the demand is made to determine for himself what he will do in respect to it. He may pay or reject it; he may submit to arbitration, open his own courts to suit, or consent to be tried in the courts of another nation." See, also, 2 Wharton's Digest on International Law. Oliver. American Trading Co., Inc., v. Mexico (C. C. A.) 5 F.(2d) 659.

Referring to the fifth and to the sixth separate defenses, the questions of law presented in these are similar. It is to be noted that the answer sets up that the shipments of gold in question were shipped by the State Bank of the Union of Soviet Socialist Republics, and that it appears from the pleadings of the plaintiff that its gold was seized by the Government of Russia and that the State Bank of the Union of Soviet Socialist Republics was a part of said government, so that the plaintiff is here asserting that the gold in question is claimed by the Union of Soviet Socialist Republics in opposition to the plaintiff's rights, and the result is a suit brought in this jurisdiction which involves the title to property claimed by the Russian Government, and that leads to the consideration of the question: Who is the sovereign de facto or de jure in Russia? And this is not a judicial but is a political question, and it is immaterial whether the foreign sovereign has been recognized or not. Wulfsohn v. Russian Republic, supra; Jones v. United States, 137 U. S. 202, 11 S. Ct. 80, 34 L. Ed. 691.

Furthermore, it is alleged by the plaintiff itself that the Union of Soviet Socialist Republics is a foreign government, so that as in the Wulfsohn Case, it is unnecessary for that fact to be made known to the court by a formal "suggestion" through the State Department. Thus, it appears that this court is not in a position to pass upon the issue, not because of nonrecognition but simply for the reason, as stated by Judge Andrews in Wulfsohn v. Russian, etc., Republic, supra, at page 376 of 234 N. Y. (138 N. E. 26): "They may not bring a foreign sovereign before our bar, not because of comity, but because he has not submitted himself to our laws. Without his consent he is not subject to them."

Therefore, in my judgment both of these alleged defenses should be permitted to stand.

Relative to the seventh separate defense, this should be permitted to stand for the reasons expressed above. While it is true that Russian Reinsurance Co. v. Stoddard, supra, was a case in equity, the same principles of justice apply, namely: That the defendants, who were American nationals, should not be subjected to double liability.

Finally, taking up for consideration the second separate defenses, That the demands served by plaintiff preliminary to instituting suit did not afford defendants an opportunity to ascertain the facts upon which plaintiff based its claim to the gold, and that in any event defendants, as bailees, were entitled to and did return it to their respective bailors.

Here it is timely to remark that reference has been made in the plaintiff's brief to a motion made by the defendants to strike out plaintiff's amended complaint which was heard and denied by me in open court, and it is desirable to remove any doubt as to the ground of that denial, if any such doubt exists. That motion was denied by me for the reason that Judge Winslow, in a previous order, had granted permission to the plaintiff to serve an amended complaint, and the amended complaint conformed to the requirements of a complaint in an action of replevin. The court did not then consider nor pass upon the question as to whether a demand for the gold by the plaintiff upon the defendants was necessary before suit could be brought against them.

The amended complaint does not aver that the defendants came into possession of the gold wrongfully. It alleges: "That before and at the commencement of this action the defendant had and thereafter held said chattels in its possession in violation of plaintiff's rights * * * and that the possession of said chattels by defendant was and still remains unlawful, and the defendant still detains the same from the plaintiff." It also alleges in a succeeding paragraph: "That before and at the commencement of this action

plaintiff demanded of the defendant herein the possession of said chattels, but that the defendant refused to deliver the same or any part thereof to plaintiff." The answers to the amended complaint deny the refusal of plaintiff's demand.

It is well settled that a demand must be alleged in an action based merely on wrongful detention of a chattel; also a refusal to turn it over, or there must be an averment of facts which show a wrongful withholding of the property without a demand. Rule 271 of the New York Civil Practice Rules; Scofield v. Whitelegge, 49 N. Y. 259; Wagman v. Raynor, 163 App. Div. 68, 148 N. Y. S. 471; Chapin v. Merchants' Nat. Bank, 31 Hun (N. Y.) 529; Rogers v. Conde, 67 App. Div. 130, 74 N. Y. S. 390; 34 Cyc. 1405, and cases cited therein.

In the case at bar the allegations of the complaint consist merely of that of ownership, a demand by the plaintiff, and a refusal by the defendants. A demand and refusal must be made, although the bailee has received the chattel from one who received it unlawfully, where the bailee comes into the possession of the property innocently. Barrett v. Warren, 3 Hill (N. Y.) 348; Jessop v. Miller, *40 N. Y. 321; Ely v. Ehle, 3 N. Y. 506; Fuller v. Lewis, 13 How. Prac. (N. Y.) 219; Pease v. Smith, 61 N. Y. 477; McDonnell v. Buffalo Loan, Trust & Safe Deposit Co., 193 N. Y. 92, 101, 85 N. E. 801. See, also, Cobbey on Replevin, §§ 458, 467. See Wykoff v. Stevenson, 46 N. J. Law, 326, in which the court stated: "There is a line of cases which hold that where goods have been deposited with a person for any purpose, and any other person than the depositor demands them of the bailee, the latter is not liable to an action of trover until he refuses to deliver after a reasonable time taken and opportunity given, to ascertain the true ownership of the property. Lee v. Bays, 18 C. B. 607; Carroll v. Mix, 51 Barb. 212; Alexander v. Southey, 5 B. & Ald. 247; Isaac v. Clark, 2 Bulst. 314." See, also, Clayton v. Le Roy, 2 K. B. D. 1031.

The demand and the refusal of the one holding the chattels to deliver it over is merely evidence of conversion. So that if the nature of the reply or refusal is of such a character as not to indicate a conversion it would follow that such a refusal could not be the basis of an action for conversion or replevin. Where, for instance, upon a demand being made, the holder of the chattel does not refuse but simply requests a reasonable opportunity to verify or investigate the rights of the one demanding the chattel,

logically, it would seem that if suit were immediately brought, based on such refusal, it would be premature for the reason that as yet there might then be no evidence of a conversion by the holder. "The rights of the parties must be determined as they stood at the commencement of the suit." Storm v. Livingston, 6 Johns. (N. Y.) 44; Wisner v. Ocumpaugh, 71 N. Y. 113.

In Carroll v. Mix, 51 Barb. (N. Y.) 212, 214, Judge Ingalls, referring to a bailee from whom a third party had demanded property coming into his possession, innocently stated: "If the defendant Mix had absolutely refused to deliver it to the plaintiff; or had denied his right to it, or had assumed to be the owner of it; or had interposed an unreasonable objection to delivering it; or had exhibited bad faith in regard to the transaction, a conversion of the property might have been inferred. We are clearly of opinion that the plaintiff failed in this particular. In Monnot v. Ibert (33 Barb. 24), Justice Emott remarks—'It is true the authorities require that the refusal should * * * not be a mere excuse or apology for not complying immediately, as when the demand is made by an agent, and the other party wishes to verify his authority before complying, or of an agent who must consult his principal.'"

In Singer Mfg. Co. v. King, 14 R. I. 511, 512, the court stated: "Thus it is no conversion for a bailee of a chattel who has received it in good faith from some person other than the owner, to refuse to deliver it to the owner making demand for it until he has had time to satisfy himself in regard to the ownership." To the same effect is Wykoff v. Stevenson, supra. And also the English case of Clayton v. Le Roy, supra, which contains an interesting discussion of the subject. So that I think that the weight of authority, as well as reason, supports the view that a bailee does not thereby necessarily become liable for conversion of property, because he does not immediately hand it over to a third party who demands it. A refusal or a failure to deliver it within a reasonable time after the demand from which the refusal is inferred is prerequisite.

Therefore, this part of the second separate defense, alleging that plaintiff did not allow defendant reasonable opportunity after the demand to investigate or determine the merits of the claim of ownership before commencing the action, should be permitted to stand.

In so far as the second defense alleges that, subsequent to the plaintiff's demand, defendant returned the property to defendant's

bailor, it is stricken out, for this is not a good defense. One case is cited by defendant in support of such a defense. Hunter v. Servier, 7 Yerg. (Tenn.) 127, a Tennessee case decided in 1834, which is contrary to the well-settled rule. See 34 Cyc. Replevin, p. 1342 et seq.

Accordingly, plaintiff's motions to strike out the separate defenses in the answers are denied, with the exception that they are granted to the extent of striking out that portion of the second separate defense which seeks to set up as a defense that after plaintiff's demand the gold was returned to the defendants' respective bailors.