DORR (BRYCE v.). See Case No. 2,070.

## Case No. 4,006.

### DORR v. GIBBONEY et al.

[3 Hughes, 382.][1]

Circuit Court, W. D. Virginia. June 2, 1878.

EQUITY—SUIT FOR BREACH OF TRUST — PARTIES— WAIVER OF OBJECTIONS—CONFISCATION BY CONFEDERATE COURT — DECREE IN ATTACHMENT — SPECIAL APPEARANCE.

1. On a deed of assignment to a trustee to secure creditors whose debts were all ascertained and who were marshalled by the deed into four classes. a bill in chancery was brought by one of the fourth class against the trustee's executrix for a breach of trust by the trustee. Held, that it was not necessary to make the other creditors parties to the suit.

2. At all events it was too late to make such an objection at the hearing.

3. Payment of the debt, by the trustee, to a receiver under a decree of confiscation of a Confederate court, was a breach of trust as against a loyal citizen.

4. A decree in an attachment case instituted during the war by seizure of the property and publication of notice, was void as against a loyal citizen and could be impeached even collaterally.

5. An appearance. after such a decree was rendered, for the mere purpose of moving to strike the case from the docket on the ground that no process had been served, was not such an appearance as waived previous defects in the service, and could not have the retroactive effect of validating a decree totally void.

[Cited in Romaine v. Union Ins. Co., 28 Fed. 638; First Nat. Bank of Danville v. Cunningham. 48 Fed. 518.]

[This was a bill in equity by A. H. Dorr against Robert Gibboney's executrix and others.] In 1859 Thomas L. Preston made to Robert Gibboney as trustee a deed of assignment to secure his creditors. The deed marshalled the debts into four classes and directed that they should be paid in that order of priority. Among the debts mentioned in the fourth class was "a debt due by negotiable note to A. H. Dorr (a citizen of New York) of $2,650." In 1862 the trustee sold to W. A. Stuart, G. W. Palmer, and G. B. Parker. a great part of the property conveyed for $425,000, an amount sufficient to pay all the debts mentioned. It was stipulated that in case any of the creditors did not accept payment in Confederate currency, the purchasers should substitute their notes for such debts until they could be paid. In 1861 this debt was confiscated by John W. Johnston. receiver of the Confederate government, and paid to him by Gibboney, on the decree ob-

tained in August, 1862. But in the meanwhile one Philip Rohr had sued out a process of foreign attachment against Dorr and served it upon Gibboney, accompanying it also by publication of notice, dated August 9th, 1862. A decree was rendered in his case after the war, but there was no renewed order of publication. In 1862, however, the money was loaned by John W. Johnston, receiver, to Philip Rohr. In 1873, Gibboney having died in the meanwhile, Dorr brought suit against his executrix, making parties Thomas L. Preston, Stuart, Palmer, and others, but not making any of the other creditors parties. No demurrer or plea was filed on this ground. The answer, which was not filed for some time, relied on the payment under the decree of confiscation and also on the decree in the attachment case, claiming that this decree could not be collaterally impeached. At the hearing the point was also made that the other creditors should be parties. Dorr, by his counsel, had appeared in the state court, where the attachment case of Rohr had been decided, and moved to strike the case from the docket. It was insisted by the defendants that this was such an appearance as to waive the objection to the defect of summons.

James H. Gilmore and Robert M. Hughes, for complainant, cited Perdicaris v. Charleston Gas Light Co. [Case No. 10,973], affirmed on appeal in 96 U. S. 193; Shortridge v. Macon [Case No. 12,812]; Williams v. Bruffy, 96 U. S. 176; Dean v. Nelson, 10 Wall. [77 U. S.] 172; Ludlow v. Ramsey, 11 Wall. [78 U. S.] 581; Lasere v. Rochereau, 17 Wall. [84 U. S.] 438; Earle v. McVeigh, 91 U. S. 503; Pow. App. Proc. 106, 119, 134, et seq.; D'Arcy v. Ketchum, 11 How. [52 U. S.] 165; Webster v. Reid, Id. 437; Fairfax v. City of Alexandria, 28 Grat. 34; Cuyler v. Ferrall [Case No. 3,523]; Fretz v. Stover, 22 Wall. [89 U. S.] 198.

Joseph W. Caldwell, for Gibboney's executrix, and Johnston & Trigg, for Stuart and Palmer, cited Lancaster v. Wilson, 27 Grat. 624; Voorhees v. Bank of U. S., 10 Pet. [35 U. S.] 449; Walden v. Craig, 14 Pet. [39 U. S.] 154; Cooper v. Reynolds, 10 Wall. [77 U. S.] 308; Pennoyer v. Neff, 95 U. S. 714.

RIVES, District Judge. Before entering on the examination of this case, it is necessary to dispose of the objection made to the hearing for want of proper parties to the bill. At this stage of the proceedings, such an objection cannot be heard unless for defect of parties; the court should be disabled from passing on the very right of the cause. If, however, the objection had come at an earlier stage by way of a preliminary demurrer. it could scarcely avail. There is here no community of property or interest between the complainant and the other cestui que trust under the deed, in the subject of his claim; his is a separate ascertained demand,

[1] [Reported by Hon. Robert W. Hughes. District Judge, and here reprinted by permission.]

wholly unconnected with any general question of the administration of the trust fund, and it is hard to conceive how the other creditors could be interested in his recovery, not from the general fund, but from the trustee, whom he seeks to hold liable on account of the actual receipt thereof. This case, therefore, falls under the exceptions to the general rule so well defined in Story's Equity Pleadings, §§ 207a, 212. The complainant has his fixed share of the trust fund, and there can be no necessity, on the ground of principle or authority, to make any other parties than those he has already made to his complaint. His debt is secured by the general trust deed of Thomas L. Preston of the 7th July, 1859, and is included in the fourth class under the designation of "a debt due by negotiable note to A. H. Dorr of $2,-650." The bulk of this trust property, consisting of the Preston Salt Works estate, and the lands contiguous thereto, and certain interests in the King's Salt Works, with the appurtenant lands, were sold on the 10th day of June, 1862, by the trustee, Robert Gibboney, to W. Alexander Stuart, George W. Palmer, and George B. Parker, for the sum of $424,000. This contract having been made during the Rebellion, it was contemplated by the parties to this contract that the trustee would not be able to pay off the creditors with the currency of that belligerent era; and hence it was expressly stipulated by the purchasers, that in case of the refusal of creditors to receive such currency in payment, they were to substitute their notes for the amount so refused, secured, to the satisfaction of said Gibboney, in equal instalments, payable in one, two, three, four, and five years, from the first of July then next ensuing, or sooner, at the election of said purchasers, with interest from said first of July, and on the whole amount, payable annually.

In this state of facts, on the 22d October, 1861, the trustee, Robert Gibboney, was served with interrogatories from John W. Johnston, receiver of the Confederate States, acting under the sequestration act of that government, of the preceding May, and, without delay, on the very day of service, made return of this debt to Dorr, as a citizen of New York. Thereupon the said receiver, suing in the name of said Confederate States, procured a decree of sequestration in the district court of the Confederate States for the western district of Virginia, on the first day of August, 1862, of this particular debt. But inasmuch as Gibboney, in his surrender of this claim, stated that it had been attached in his hands by Philip Rohr, this decree of sequestration recites that fact, and the willingness of Gibboney to pay to the proper person; and then directs him to pay it, with accrued interest, to said receiver, John W. Johnston, with this added provision, that said Johnston should lend it on good security, or if unable to do so, invest the same in eight per cent. Confederate bonds or seven

30-100 per cent. treasury notes, to await the decision of the suit brought by said Rohr against said Dorr. Accordingly, on the very day of this decree, we find among the vouchers of Gibboney, trustee, as aforesaid, in the record of Preston v. Stuart, made an exhibit in this cause, p. 140, the following receipt: "$3,137.15. Received of Robert Gibboney, trustee of Thomas L. Preston, three thousand one hundred and thirty-seven dollars and fifteen cents, paid me under the within decree (Confederate States, by J. W. Johnston, receiver, v. R. Gibboney, trustee, etc.). John W. Johnston, Receiver. August 1, 1862." And in the Rohr record, p. 26, we find the bond of Philip Rohr, etc., to John W. Johnston, receiver, under an order of the Confederate States district court in the case against Robert Gibboney, trustee for Thomas L. Preston, to sequester the estate of A. H. Dorr, for the same identical sum of $3,137.15. In the settled account of said Gibboney, we find he credits himself by the same amount "paid John W. Johnston, receiver." So far, then, as Gibboney is concerned, his defence rests on the sequestration alone. He does not hold the fund subject to the attachment of Rohr. He is content with the protection and authority of the Confederate tribunal, and parts with the fund to its receiver, leaving the court to preserve the fund for the satisfaction of the attaching creditor in its own way.

Was not this conduct under the circumstances a breach of trust, for which the trustee should be held liable? It has been seen that he was under no obligation to receive the currency of that day, where it could not be paid to the creditors; on the contrary, he stipulated for its refusal, and the substitution of time notes in its stead. We have shown that he knew Dorr was a non-resident; a citizen of New York; and that he could not satisfy his debt with Confederate notes. Why, then, did he agree to take them? Why did he not avail of his own stipulation for such a case by taking the bond of the purchasers for such a period as would probably cover the duration of the revolt? It is only to be deemed a shift, in flagrant disregard of his duty to his non-resident cestui que trust, to accommodate the purchasers, to expedite his administration of the trust, and signalize his obeisance to the rebel authorities. He must have known and felt that creditors in the loyal states could not be paid in Confederate notes. This principle, as laid down by the supreme court in the case of Fretz v. Stover, 22 Wall. [89 U. S.] 198, must have commended itself to men of ordinary sense, and least versed in business or commerce, even during hostilities. I cannot. therefore, but regard the taking of this depreciated currency as evidence of a purpose to betray the creditor in the state of New York, while the trustee was thereby to gain credit for his zeal in the Confederate cause, and his alacrity in obeying the se-

questration act of the Confederate congress. But above and beyond this consideration, is the absolute nullity of these sequestration proceedings. They depended for their validity upon the success of the Rebellion. With its suppression, they perished; and to respect them now would be inconsistent with the rightful pretensions of the government and the actual results of the war. They are nullities. They are not to be respected by any court, state or federal. I have had repeated occasions to pass upon them in this circuit; and have never hesitated in this view of them, before I could be guided by decisions in the last resort. Since then, we have the case of Perdicaris v. Charleston Gas Light Co. [supra], approved by the supreme court; and the recent case of Williams v. Bruffy, 96 U. S. 176, decided by the supreme court on error from our own court of appeals. This position is virtually conceded in argument by the counsel for the defendants. But they seek to escape its force by sheltering themselves under the attachment suit of Philip Rohr, of which profert is made in the answer of Gibboney's executrix. They rely upon the judgment in that case, as conclusive upon the complainant here.

How far judgments may be collaterally assailed, has been settled by elementary writers and a long course of decisions in the supreme court of the United States, and the appellate courts of the several states. Where the jurisdiction is conceded, errors or irregularities in proceedings conducting to the judgment, are subjects for correction by appeal or otherwise, and can never be used to assail or impeach collaterally such judgment. But where jurisdiction is lacking, either over the person or property, the judgment is void, and has no sanction or validity in any court that has to pass upon it, though collaterally. There must, therefore, be some jurisdictional defect in the judgment to authorize or justify its impeachment in a collateral suit. Thus, in a suit in personam, it is held there can be no jurisdiction save by service of the process on the defendant, or by his personal appearance. This is said to rest on a principle of natural justice, and to constitute that due process of law required by the fourteenth amendment of the federal constitution. And although the law of the state may authorize a substituted service by publication where the non-resident has property in the state that can be subsequently taken on execution upon the judgment to be obtained upon such published summons, yet if the seizure of such property is not the primary object of the suit. it is to be deemed a personal judgment and without validity if it be rendered by a state court in an action upon a money demand against a non-resident of the state, who was served by publication of summons. but upon whom no personal service of process within the state was made. and who did not appear. Pennoyer v. Neff, 95 U. S. 714. But it is otherwise where the proceeding is in rem.

The jurisdiction there rests on the duty and right of the state to protect its citizens in their contracts with non-residents, and to control the estate of the latter within its territorial limits. A seizure of the property under the laws of the state, and in the mode prescribed by them, is a species of notice to the non-resident or his agent, and extends only to the property seized. The judgment in such cases of attachment, though personal in terms,. extends only to the property, and if not satisfied by it, cannot be availed of, in any way or in any court, to recover the deficiency; but to the extent of that deficiency is wholly void. Cooper v. Reynolds, 10 Wall. [77 U. S.] 308. But the fundamental requisites of such jurisdiction must be sought in the terms of the statute. I will not deny that in such cases the state might prescribe the seizure alone as the ground of jurisdiction, but it is certainly more consonant with natural justice to give the party the benefit of a published summons. Hence, so universal is the legislative sense of fairness, and the desire to protect person and property from any judicial action, of which the best practical notice was not given, that in the attachment laws of the states, so far as I have any knowledge, particular provision is made to couple with the seizure a publication of summons. This mode of proceeding is in derogation of the common law; and it is a credit to our systems of jurisprudence that they adopt every practicable precaution to avoid shocking the common sense of justice, and impairing the sanctity of judicial sentences by insuring to absent parties the opportunity of being heard in defence of their rights of property as well as of person. No man's property should be taken from him and given to another unless by lawful authority, lawfully pursued, and the duty of guarding an absent one against the unlawful seizure and transfer of his property, without his knowledge, is more sacred and more consonant with the maxims of law and the dictates of justice than that of insuring to the resident citizen the fruits of his contracts with the absent owners of property that may be justly made liable to his claims. Drake, Attachm. (4th Ed.) note to section 89a. This state has reflected in its statute this sentiment of enlightened jurisprudence. It does not exact of the absent defendant what might be termed the "summum jus" of its territorial jurisdiction and sovereignty. It does not predicate its jurisdictional right of the seizure alone, but requires, as a prerequisite, an order of publication. Code Va. 1873, p. 1014, § 20. In every case of attachment in this state, then, two fundamental facts must appear to give jurisdiction. First, the seizure; secondly, the order of publication. The one will not do without the other. Both must concur to give validity to the judgment, otherwise it is void.

The sufficiency and regularity of the seizure in this case is beyond dispute, and is not in

controversy. But the objection lies to the order of publication, of which affidavit is duly made under date of the 9th of August, 1862. The publication was, therefore, made during the war, when all intercourse or correspondence between the citizens of the belligerent states was interdicted. Dorr could not lawfully have received it, and if he had done so surreptitiously, he could not have obeyed the summons, and repaired to his defence before an insurrectionary tribunal. The question, therefore, arises whether a publication under such circumstances fulfils the requirements or intentions of the law. Had these transactions transpired in a time of peace, there can be no doubt of the validity of this judgment. But a publication flagrante bello, purporting to be notice to a citizen of a belligerent state, is, in the language of Justice Bradley, delivering the opinion of the court in Dean v. Nelson, 10 Wall. [77 U. S.] 172, "A mere idle form; the party could not lawfully see or obey it." I would add further, it is a mockery of justice. To the same effect are the subsequent cases of Ludlow v. Ramsey, 11 Wall. [78 U. S.] 581; Lasere v. Rochereau, 17 Wall. [84 U. S.] 438; and Earle v. McVeigh, 91 U. S. 503. Under these decisions I am constrained to regard the publication of the summons at that time and under the circumstances as a nullity. There is, therefore, in my view a jurisdictional defect in these proceedings by attachment, which renders the judgment void.

But in the argument of this cause a fuller record of the Rohr attachment was submitted, whereby it appeared that long after the rendition of this judgment, to wit, at the January term. 1874, "came A. H. Dorr, by counsel, and asked leave of the court to make a motion to strike this cause from the docket, which is granted him, and thereupon he moved the court to strike this cause from the docket for the reason that the said Dorr had no notice of the commencement of said proceedings, and for this reason they were null and void, because from the pleadings it appears that said Dorr was a citizen of the state of New York at the time of the institution of this suit." It is now claimed that this was an appearance of the defendant, superseding the necessity of summons or publication. But if regarded as an appearance at all it is subsequent to the judgment and cannot be now invoked to impart validity to an anterior judgment, otherwise void. Besides, such motion by counsel for defendant cannot rightfully be construed as an appearance of the defendant in ratification or approval of illegal proceedings against him. On the contrary, if an appearance at all, it is by way of protest against the judgment, and cannot under any circumstances impart by retroaction a validity to it, which it did not originally possess. This course of reasoning conducts me to the conclusion that the judgment in Rohr's attachment suit was void, and of no obligation upon the complain-

ant in this cause; and especially that it cannot be availed of by the executrix of Robert Gibboney to shield his estate for his accountability by reason of his illegal acceptance of Confederate notes in satisfaction of Dorr's debt, and of the nullity of his transaction with the Confederate receiver, John W. Johnston. His estate in the hands of his executrix is primarily liable to the complainant; but if it should prove insolvent, the plaintiff, on the authority of Fretz v. Stover, heretofore cited, has not lost his recourse against the original debtor, Thomas L. Preston, or his trust estate. But, in no event can the defendants, Palmer, Stuart & Co. be held responsible; they were absolved by Gibboney, and cannot be deprived of the acquittance he gave them and had the right to give them. The plaintiff, therefore, must be decreed his debt and costs against Gibboney's executrix, and the cross-bill must be dismissed with costs.