JAMES L. O'NEILL AND HENRY A. OETJEN, APPELLANTS,
v. CENTRAL LEATHER COMPANY AND PENNSYLVANIA
RAILROAD COMPANY, RESPONDENTS.

Argued March 16 and 17, 1915—Decided June 14, 1915.

1. The official communications by the president to congress leave
   no doubt or room for a contrary inference that in November,.
   1913, and January, 1914, the Carranza and Villa forces in Mex-
   ico were recognized by our government as engaged in actual war.
2. The right of the commander of an army in actual possession of
   a large territory, who observes the ordinary laws of war, to seize
   private property to meet his military necessities, does not de-
   pend on the existence of belligerency in the technical sense but
   on the existence of belligerency in the sense of actually existing
   warfare.
3. The right of a military commander to levy contributions must
   be exercised in accordance with the laws of war. Contributions
   must be levied by the commander-in-chief or by the general of a
   corps acting independently.
4. By agreement between General Villa, whose forces were in actual
   possession of the district in Mexico, and the citizens, a war con-
   tribution was assessed by commissions appointed by the tax-
   payers; one who was assessed failed to pay and property be-
   longing to him was seized by virtue of a general order and sold.
   *Held*, that the title passed by that sale is not open to inquiry in
   our courts.

On appeal from the Hudson Circuit.

For the plaintiffs, appellants, *John M. Enright*. and *Oscar
R. Houston* (of New York).

For the defendants, respondents, *Morgan J. O'Brien* (of
New York) (*William D. Edwards* with him).

The opinion of the court was delivered by

SWAYZE, J.    The question to be decided is the title to cer-
tain hides claimed by the plaintiff under Martinez, the former
owner, and by the defendant, Central Leather Company, under
a title based on a seizure in Mexico by military forces under
the authority of General Villa.

1. In cases of this kind the courts are bound to follow the action of the political branches of the federal government where there has been such action. *Jones* v. *United States*, 137 *U. S.* 202. Our first question is therefore what action has been taken by the federal government. We are informed of this by various documents submitted in evidence. The letter from Mr. Lansing, counselor to the department of state, written for the secretary of state, under date of August 20th, 1914, makes it clear that our government has never recognized any government in Mexico headed by Carranza or Villa and has never recognized as belligerents within the intent and meaning of the law of nations any forces operating in Mexico under their command. This explicit declaration of Mr. Lansing acting officially, settles that question as far as this court is concerned and leaves nothing to inference.

When we examine further to determine what is the exact position taken by our government with reference to the forces under the command of Carranza as chief, and the immediate command of Villa, we find no such explicit declaration, but the official communications by the president to congress leave no doubt or room for a contrary inference that at the time the hides in question were seized in November, 1913, and sold in January, 1914, the Carranza and Villa forces were recognized by our government as engaged in actual war. In a message to congress on August 27th, 1913, the president stated his efforts to secure the abdication of the Huerta government, and said that the territory "in some sort controlled by the provisional authorities at Mexico City (the Huerta government) has grown smaller, not larger;" that "difficulties more and more entangle those who claim to constitute the legitimate government" a "claim they have not made good in fact." He states that he has suggested a settlement conditioned on immediate *cessation of fighting* throughout Mexico, a *definite armistice solemnly entered into and scrupulously observed;* security for an early and free election in which all will agree to take part; the agreement of all parties to abide the result of the election and to co-operate in organizing and supporting the new administration. These refer-

ences to a cessation of fighting and definite armistice obviously recognize that fighting is going on and that it is of such a character that it may be stopped by an armistice, a word appropriate only to a condition of warfare. "An armistice suspends military operations by mutual agreement of the belligerent parties," article 36 of the Hague Convention of 1907, as to regulations concerning the laws and customs of land warfare. It is a word that cannot properly be applied to agreements between a government on the one side, and rioters, brigands or banditti on the other. The message of the president, moreover, contemplated an agreement between parties who had the power to secure the scrupulous observance of agreements solemnly entered into and of an agreement to abide the result of an election. If there could be any doubt that the president thereby recognized that the armed forces in Mexico were divided into parties who could command the obedience of their members and that their armed struggle was war, that doubt would be removed by his further declaration that it is our duty to show what true neutrality will do to enable the people of Mexico to set their affairs in order again. Neutrality is a word not properly applicable except as between armed forces engaged in war which our government desires to treat on a plane of absolute equality. The necessary inference to be drawn from the use of the word "neutrality" is confirmed by subsequent language in the message. The president speaks of increased danger to noncombatants in Mexico as well as to those actually in the field of battle and says that he deems it his duty "to see to it that neither side to the struggle now going on in Mexico receive any assistance from this side of the border;" he refers to the "best practice of nations in the matter of *neutrality.*" The evidence proves that this recognition by the president of a state of war between the Huerta government and the Carranza government was merely a recognition of existing facts. Prof. Beale defines war as follows (9 *Harv. L. Rev.* 407) : "War, in law, is not a mere contest of physical force, on however large a scale. It must be an armed struggle, carried on between two political bodies, each of which

exercises *de facto* authority over persons within a determinate territory, and commands an army which is prepared to observe the ordinary laws of war."

That the struggle in Mexico in 1913–1914 was an armed struggle is well known; that it was carried on between two political bodies, one the Huerta government claiming to be the legitimate successor of the formerly existing Mexican government, and the other the Carranza government organized under the so-called Plan of Guadelupe, is proved; that each exercised *de facto* authority over persons within a determinate territory and commanded an army is proved; that the Carranza forces at least were prepared to observe the ordinary laws of war is shown by their adoption of our own regulations.

Our government has, however, gone further than merely to recognize that the two contending parties were at war. On December 2d, 1913, the president in his annual message spoke of Huerta's authority as usurped and said there could be no lasting peace until he surrendered it. If Huerta's authority was usurped, if peace was impossible until he surrendered, armed resistance to that authority was justified. The president added the most important declaration "Mexico has no government." In that situation the only control resembling governmental authority must have been in the commanders of the armed forces in possession of the particular district or in the governments of the separate states of the Mexican Republic. In fact the State of Chihuahua, having twice the area of the State of New York, and a large part of the State of Coahuila, were under the control of Carranza and Villa at the time the hides in question were there seized and sold; the municipal government of Torreon favorable to them had been restored after Villa's capture of the city, and Martinez, a Huerta supporter, was in hiding and subsequently fled.

2. The next question is whether the commander of an army in actual possession of a large territory who observes the ordinary laws of war, has the right, according to those laws, to seize private property to meet his military necessities. We

need not go so far as to consider whether in the absence of government in Mexico as the president has decided, a military government under such circumstances would be entitled to be considered a *de facto* government so as to deprive us of any right to question its acts as to the property of Mexicans within the Mexican territory controlled by it. *American Banana Co.* v. *United Fruit Co.*, 213 *U. S.* 347. We need only inquire into the rights of parties to a war under the laws that govern that situation. These rights do not depend on the existence of belligerency in the technical sense, but on the existence of belligerency in the sense of actually existing warfare. The distinction was pointed out by President Cleveland in his first and seventh annual messages (9 *Harv. L. Rev.* 406), and by the United States Supreme Court in *The Three Friends*, 166 *U. S.* 1, 63, 64. Belligerency in the strict technical sense, that is belligerency recognized by another power, involves such serious disadvantages to the recognizing power, such as the right of blockade by either belligerent, the right of visitation, search, and seizure of contraband on the high seas, abandonment of claims for reparation on account of damages suffered by citizens of the recognizing power, that recognition depends not merely on the actual fact of existing war, but on the policy of other powers and the necessity of recognition of belligerency by them. But there may be a recognition of a condition of political revolt, a situation between recognition of the existence of war in a material sense and of war in a legal sense. Such was the case of The Three Friends above cited, in which our neutrality act was held applicable at the time of the insurrection in Cuba. The court held that although never recognized even as belligerents, the insurgents were "a people" within the meaning of the neutrality act, as the attorney-general put it in his brief, because they were a political organization, engaged in a political enterprise; it was those facts that saved the owners of The Three Friends from being pirates and subjected them only to the penalties of the neutrality act. A similar recognition, if not more, has been accorded by the president to the Carranza-Villa forces. We

are in duty bound under the declaration in his messages to congress, to preserve neutrality; this cannot be done unless we accord to both parties alike all the rights permitted by the rules of war, and even if the Carranza-Villa forces were no more than insurgents, we should have to treat them like any other belligerent as to whom we desired to be entirely fair without subjecting ourselves to the inconveniences that would arise from a formal recognition of belligerency. No such troubles can arise from acts done on Mexican soil and affecting Mexican property only. The courts of one country, says Chief Justice Fuller in *Underhill* v. *Hernandez,* 168 *U. S.* 250 (at *p.* 252), will not sit in judgment on the acts of the government of another done within its own territory, and this principle is not confined to lawful or recognized governments, or to cases where redress can manifestly be had through public channels. "The immunity of individuals from suits brought in foreign tribunals for acts done within their own states, in the exercise of governmental authority, whether as civil officers or as military commanders, must necessarily extend to the agents of governments ruling by paramount force as matter of fact." In the absence of any government in Mexico, a fact as to which the president's statement is conclusive upon us, the rule by paramount force in any particular district is provable as matter of fact by evidence, which in this case is neither left in doubt nor subject to possible inference to the contrary. Warfare has been recognized by the president as existing, and although he has not officially determined in what particular territory or at what particular time Carranza and Villa were in control, he has said in public messages to congress that only part of Mexico was under Huerta's control and that has grown smaller not larger. He has thus left it open, in fact made it necessary, for the courts in a proper case to determine whether a particular territory was in control of one party or the other. The action in Underhill *v.* Hernandez was an action for personal torts, but we are equally bound by the same legal principle in an action involving the title to personal property if title thereto can ever be passed by a military

commander exercising paramount force. That title can be
so passed is well settled, since the right to confiscate property
or levy military contributions is one of the rights of the mili-
tary occupant of a territory. The reason for permitting an
armed force to levy contributions or even to confiscate prop-
erty in territory occupied by them, apply as well to insurgents
conducting war in a material sense as to recognized belligerents
conducting war in a legal sense. The reason is the necessity
of carrying on the usual operations of government and of
supporting the army. As the old practice of private pillage
was frowned on and discontinued, the milder and more ef-
fective system of requisitions (a term sometimes attributed
to Washington), contributions and confiscations took its place.
The advantage was that the latter were under the control of
the military authorities and the burden was not only better
distributed but the evils attending private pillage ceased; the
inhabitants of the conquered territory suffered less and the
conquerors gained more. Whether the practice is to be jus-
tified on ethical grounds is disputed by Bonfils (*Dro. Int.
Pub.*, §§ 1218–1225), but is recognized by him as existing
usage (§ 1226), as it is by other text-writers. *Hall* (*5th
ed.*) 427; *Wheaton* (*Atlay's ed.*) 482, quoting Halleck (7
*Moore Int. L. Dig.* 280). The rule had the approval of the
Hague Conference of 1907 in its effort to codify the rules
of war. Articles 48 and 49. It has had the approval of our
government and of our acts in accordance therewith (7 *Moore
Int. L. Dig.* 285, 286); and of the United States Supreme
Court. *Miller* v. *United States,* 11 *Wall.* 268, 304. The
question was directly involved in that case since unless the
confiscation acts could be justified under the war power of
the constitution, they would be void because in violation of
the fifth amendment. After pointing out the right of con-
fiscation under the rules of war as between independent na-
tions, the court said that every reason for the allowance of
a right to confiscate in case of foreign wars exists in full
force when the war is domestic or civil, and referred to the
*Prize Cases, 2 Black* 635. The latter are interesting because
the right to condemn was asserted in favor of our govern-

ment, although it had not recognized the confederate states as belligerents. An excellent statement of the rule and the reason by which it is justified is to be found in 15 *Harv. L. Rev.* 140, 141.

The right to levy contributions is distinctly a conqueror's right and rests upon paramount force; it does not depend upon the recognition of belligerency with all that accompanies it, nor is its exercise limited to recognized belligerents; existing warfare and actual occupancy of the territory are the conditions necessary. Since the right exists under the laws of war, it must be exercised in accordance with those laws. It must not be confused with mere brigandage or looting. Contributions must be levied either by the commander-in-chief, or by the general of a corps acting independently. *Hall* 428, 429; adopted by Moore (7 *Moore Int. L. Dig.* 281). The rule is implied in the instructions for our army during the Civil war (7 *Moore* 286). In the present case the rules of war were complied with. General Villa's forces were in actual possession of Torreon and the Laguna district. By agreement between him and the citizens, a war contribution was assessed in the district by commissions appointed by the tax-payers. An assessment was made against Martinez who as a partisan of Huerta was then in hiding. He failed to pay and his name was included in a general order to seize the property of those who refused to pay their share of the contribution. In pursuance of that order these hides were seized, and sold by General Villa. The proceedings subsequently had the approval of Carranza. We think that sale passed a title not open to inquiry in our courts. The judgment is therefore affirmed, with costs.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, VREDENBURGH, WHITE, TERHUNE, HEPPENHEIMER, WILLIAMS, JJ. 14.

*For reversal*—None.