COMPANIA MINERA YGNACIO RODRIGUEZ RAMOS, S. A., V.
BARTLESVILLE ZINC COMPANY ET AL.

No. 3225.   Decided June 24, 1925.

(275 S. W., 388).

**1.—International Law—Foreign Government—Validity of Its Acts.**

The courts of one nation will not undertake to review or revise the acts
of another as between it and its citizens, such as confiscation of their prop-
erty by it.   (P. 24.)

**2.—Same—Insurrection—Revolution—Power in Control—Recognition.**

The acts of an insurrectionary government, though in possession of
territory of a foreign nation by paramount military power, are entitled to
be respected by our courts only when the insurrection becomes permanently
successful as a revolution, and becomes the established and recognized gov-
ernment.   (Pp. 24-32.)

**3.—Same.**

Where an insurrection, though for a time successful in the control of
part or all of the territory of the government against which it revolts, fails
and is displaced by re-establishment of the latter, its acts, such as the con-
fiscation of enemy property, perish with it, and the title to property of a
citizen taken by its decree remains unaffected thereby.   (Pp. 30, 31.)

**4.—Same—Revolutionary Mexico—Villa—Carranza.**

The revolutionary attempt of Villa against the recognized government
of President Carranza in Mexico having failed and become suppressed, the
taking possession and attempted confiscation of property of a private citi-
zen (proceeds of mining) in the State of Chihuahua, by his authority, while
in control of that state and of most of northern Mexico by paramount mili-
tary power, is to be treated by the courts of Texas as invalid and inef-
fectual to transfer title from the owner.   (Pp. 24-32.)

Error to the Court of Civil Appeals for the Eighth District, in
an appeal from El Paso County.

Cia. Minera Ygnacio Rodriguez Ramos, S. A., sued the Bartles-
ville Zinc Company and others, and obtained judgment.   The ac-
tion was for conversion of ore mined by plaintiff in Mexico, to
which defendants claimed title through its seizure and attempted
confiscation by the government of Francisco Villa while in pos-
session of the State (Chihuahua) by paramount military power,
in revolt against the government of Mexico by President Car-
ranza.   Defendants appealed, the judgment was reversed (202
S. W., 1048) and appellees obtained writ of error.   The reversal
is here sustained; but the remand is with instructions for fur-
ther trial.

*Waters Davis, J. M. Goggin* and *Del W. Harrington,* for plaintiff in error.

The seizure was null and void and was not competent to pass title because it was the act of an unsuccessful revolutionary party contrary to the constitution of Mexico. Williams v. Bruffy, 96 U. S., 176; 40 Cyc., 384; Chortbridge v. Mason, 1 Abbott (U. S) 58; Stevens v. Griffith, 111 U. S., 48, 28 L. Ed., 349; Sprott v. United States, 20 Wall., 459, 22 L. Ed., 371; Lamar v. Micou, 112 U. S., 452; Texas v. White, 7 Wall., 700.

*R. C. Walshe* and *U. S. Goen (Edward F. Harris,* of counsel), for defendants in error.

Where the undisputed evidence shows that a seizure of personal property was made by a de facto government, such seizure is valid. Underhill v. Hernandez, 65 Fed. Rep., 577, 38 L. R. A., 405; American Banana Co. v. United Fruit Co., 166 Fed. Rep., 261; Thorington v. Smith, 8 Wallace, 1, 19 L. Ed., 361; Dow v. Johnson, 100 U. S., 158, 25 L. Ed., 632; Lamar v. Browne, 92 U. S., 202, 23 L. Ed., 652; Mauran v. Ins. Co., 6 Wallace 1, 18 L. Ed., 836; 22 Cyc., 1712; 40 Cyc. 318, V. cl. a, b; Underhill v. Hernandez, 168 U. S., 250, 42 L. Ed., 456; Freeland v. Williams, 131 U. S., 405, 33 L. Ed., 193; Ford v. Surget, 97 U. S., 594, 24 L. Ed., 1018; O'Neill v. Central Leather Co., 87 N. J. L., 552, 94 Atl. Rep., 789; United States v. Winchester, 99 U. S., 372, 25 L. Ed., 479; 16 Encyc. Law, 2nd ed., 1154; 22 Encyc. Law, 2nd ed., 753; 30 Encyc. Law, 2nd ed., 24.

Where a revolution is in progress in a certain territory between two factions, and civil war is being waged therein between such factions, a seizure made by either faction for military purposes would be valid, and the validity of the title would not be affected in any way as to the result of such revolution, whether it failed or succeeded. Ford v. Surget, 97 U. S. 594, 24 L. Ed., 1018; Mauran v. Ins. Co., 6 Wallace, 1, 18 L. Ed., 836.

MR. JUSTICE PIERSON delivered the opinion of the court.

For a statement of the case the following is quoted from the opinion of the Honorable Court of Civil Appeals:

"The Compania Minera Ygnacio Rodriguez Ramos, S. A., brought this suit against the Bartlesville Zinc Company, American Metals Company, Ltd., The Compania Minera de Penoles, S. A., and Compania de Minerales y Metales, et al., for damages for the conversion of forty-eight cars of ore, alleging that same was taken from plaintiff in the Republic of Mexico by un-

known parties, and shipped to El Paso, where it was unlawfully appropriated by defendants.

"The defense is that it was seized and confiscated by Francisco Villa as a military necessity—sold to parties in Mexico, from whom .it was by defendant, American Metals Company, purchased in good faith.

"The plaintiff in reply denied that the ore was taken or confiscated by any act of a sovereign state, so as to constitute it booty of a conquering army, or was taken to be used in the course of military operations, or under circumstances where danger was immediate and impending, or necessity urgent for the maintaining of the army, or the necessities of war.

"The cause was submitted to a jury on special issues, and upon the verdict judgment was rendered for plaintiff for seventy-five thousand nine hundred and two dollars and fourteen cents ($75,-902.14), from which this appeal.

"The jury found that a civil war existed in Mexico during the time the ore sued for was taken, and that armies of soldiers lead by Francisco Villa were opposed by the armies of Venustiano Carranza; that the cars of ore sued for were not taken by any force or government in possession and control of the territory where plaintiff's mine was, or by any agent of such force or government, acting by authority of such government or force. Nor was it taken by Francisco Villa, or any of his agents or officers acting by his authority or direction; nor was the proceeds thereof intended for the benefit of the faction dominated by Villa.

"The appellent (Bartlesville Zinc Co. et al.) contends that the uncontradicted evidence shows that the ore was taken under confiscation by the officers and agents of the Villa government for the use of the army.

"The evidence is uncontradicted that the ores were purchased from Hipolito Villa; that he was the financial agent of General Villa; but we find no positive statement that these ores were taken for the use of the army. There are circumstances tending to show that they were taken for his own private use, as well as circumstances indicating that they were taken by him as the representative of General Villa for the army. For this reason, we conclude that this is properly a question for the jury to determine."

The Court of Civil Appeals, after reversing the judgment of the trial court on account of the admission of certain testimony, entered its ruling upon a vital issue in the case as follows:

"The jury made the finding that a state of war existed in

Mexico at the time the ore was taken, and that Francisco Villa was at the head of a contending faction—so it became a material inquiry whether or not the ores were confiscated and sold by his, Villa's, officers, or agents as such, for the reason that under the settled law of the United States, a sale by such would convey title; so it became important that the minds of the jury be free from bias or prejudice, on account of any collateral matters in evidence, and we cannot say that such testimony did not have an improper effect upon their minds."

The Court of Civil Appeals thus held that a seizure of private property by the Villa faction in Mexico and a "sale by such would convey title." The correctness of this ruling is the issue raised by plaintiff in error in its application for writ of error.

It is admitted that the title to the ore was in plaintiff in error, and still is, unless the property was seized by Villa or his agents and the seizure and sale were the acts of a government, whose acts as such government are entitled to be respected by a foreign government.

Defendant in error's title is not based upon the right of property, but that the seizure of the property was the act of a government in Mexico and that the courts of one nation will not undertake to review or revise the governmental acts of another as between it and its citizens. This principle is cheerfully subscribed to, and, whether rightful or wrongful, if the taking of the ore by Villa or his agents was the act of such a government whose acts are entitled to respect as such, the possession of the property in the hands of the purchaser would not be reviewed or disturbed by the courts of the United States. But we cannot give to the Villa faction or government such recognition. Under the well settled principles of international law the Villa government in Mexico, although for a considerable period of time it controlled all of northern Mexico by paramount force, did not establish its legal right to rule, its acts were unlawful and are not entitled to the dignity of acts of government that the courts of a foreign nation should or can respect.

It is argued by defendant in error that the Villa government exercised governmental power and was absolute over large areas of the Republic of Mexico; that, by certain acts the government of the United States recognized it as a de facto government.

Belligerent rights may have been conceded to the Villa faction, and it may be conceded that his organization exercised powers of government over a very large area of Mexico. Yet that adds little to its pretentions of legality. If it had been successful, its legality would have been established, and its acts

would be entitled to the respect due to another government.

The recognition of the Villa faction in Mexico as belligerents could not be referred to as any sort of recognition of it as a government, certainly not a de jure government, and certainly not a recognition of the legality of its acts against the de jure government of Mexico, nor of the validity of its decrees and acts respecting private property. The acts of Villa in seizing private property or by sale attempting to divest title to it in itself being an act against the de jure government of Mexico, and one violative of rights of property, it does not appear that the courts of this country are under any duty whatever to respect and give effect to such wrongful acts.

The Supreme Court of the United States in the case of Williams v. Bruffy, 96 U. S., 185 and 186, 24 L. Ed., 716, describes certain kinds of de facto governments, analyzes their relative powers, and defines the recognition that should be given to the respective acts, as follows:

"One of them is such as exists after it has expelled the regularly constituted authorities from the seats of power and the public offices, and established its own functionaries in their places, so as to represent *in fact* the sovereignty of the nation. Such was the government of England under the Commonwealth established upon the execution of the King and the overthrow of the loyalists. As far as other nations are concerned, such a government is treated as in most respects possessing rightful authority; its contracts and treaties are usually enforced; its acquisitions are retained; its legislation is in general recognized; and the rights acquired under it are, with few exceptions, respected after the restoration of the authorities which were expelled. All that counsel say of *de facto* governments is justly said of a government of this kind. But the Confederate government was not of this kind. It never represented the nation, it never expelled the public authorities from the country, it never entered into any treaties, nor was it ever recognized as that of an independent power. It collected an immense military force, and temporarily expelled the authorities of the United States from the territory over which it exercised an usurped dominion; but in that expulsion the United States never acquiesced; on the contrary, they immediately resorted to similar force to regain possession of that territory and re-establish their authority, and they continued to use such force until they succeeded. It would be useless to comment upon the striking contrast between a government of this nature, which, with all its military strength, never had undisputed possession of power for a single day, and a

government like that of the Commonwealth of England under Parliament or Cromwell.

"The other kind of *de facto* governments, to which the doctrines cited relate, is such as exists where a portion of the inhabitants of a country have separated themselves from the parent state and established an independent government. *The validity of its acts, both against the parent state and its citizens or subjects, depends entirely upon its ultimate success. If it fail to establish itself permanently, all such acts perish with it.* If it succeed, and become recognized, its acts from the commencement of its existence are upheld as those of an independent nation. Such was the case of the State governments under the old confederation on their separation from the British crown. Having made good their declaration of independence, everything they did from that date was as valid as if their independence had been at once acknowledged. Confiscations, therefore, of enemy's property made by them were sustained as if made by an independent nation. But if they had failed in securing their independence, and the authority of the King had been re-established in this country, no one would contend that their acts against him, or his loyal subjects, could have been upheld as resting upon any legal foundation. *(Italics ours.)*

The facts of this case, we think, bring it clearly within the rules pronounced in the second kind of de facto governments, and under the principles announced, the Villa faction in Mexico was vested with no legal governmental powers, never attained to any, and its acts in seizing or confiscating property were not the acts of a government, and being wrongful could not divest title.

Continuing, the Supreme Court said:

"No case has been cited in argument, and we think none can be found, in which the acts of a portion of a State unsuccessfully attempting to establish a separate revolutionary government have been sustained as a matter of legal right. As justly observed by the late Chief Justice in Shortridge & Co. v. Macon, decided at the circuit, and, in all material respects, like the one at bar, 'Those who engage in rebellion must consider the consequences. If they succeed, rebellion becomes revolution, and the new government will justify its founders. If they fail, all their acts hostile to the rightful government are violations of law, and originate no rights which can be recognized by the courts of the nation whose authority and existence have been alike assailed.' Chase's Decision, 136."

The so-called Villa government wholly failed. If the acts of

Villa and his agents complained of are violations of law, and such as "originate no rights which can be recognized by the courts" of the legal government of Mexico, the courts of this country can hardly declare them valid and lawful, or give them the dignity of valid acts of a legitimate government.

If this act of seizure should be respected as the act of a foreign government, any acts in resistance of government, ranging in scope from general banditry and anarchy to rebellion that approaches to a revolution, would carry the sanction of authorized legal government, and though such organization utterly fail, leaving no one responsible for its acts, yet its unlawful acts in seizing private property are made lawful out of respect to a government that does not exist and never did rise to the dignity of a government.

Here we are not discussing or dealing with the humanitarian rights accorded to belligerents, but purely with the rights of property as they may be affected by the acts of a belligerent or of a so-called de facto government by its decree or acts of confiscation, i. e., the effect of such acts upon the title to property so seized.

Let it be remembered that this is not a war between two independent nations.  Here is civil war, and the belligerent, who seized and undertook to divest title to private property, wholly failed to make good its right and power to govern.  With its fall necessarily fell the authority behind its acts of confiscation, and the title to property remained unaffected by its decrees.

Further on in the opinion that court said that the validity of legislation and decrees of a belligerent does not depend upon the existence of hostilities, but upon the ultimate success of its arms. It concluded by saying:

"Whatever *de facto* character may be ascribed to the Confederate government consists solely in the fact that it maintained a contest with the United States for nearly four years, and dominated for that period over a large extent of territory. When its military forces were overthrown, it utterly perished, and with it all its enactments."

The principles announced, and which we think are clearly correct, are applicable in all respects to the facts of this case.

The Supreme Court of the United States again, in Sprott v. United States, 20 Wallace, 473, 22 L. Ed., 371, in reviewing the validity of acts of the Confederate government, said:

"When it was overthrown it perished totally.  It left no laws, no statutes, no decrees, no authority which can give support to

any contract, or any act done in its service, or in aid of its purpose, or which contributed to protract its existence."

At the close of the Civil War the United States brought suit in England against one McRae for the recovery of all moneys, goods, and property which had come into his hands as Agents of the Confederate States. In Sprott v. United States, 20 Wallace, 473, Mr. Justice Fields, in a dissenting opinion, in an interesting and illuminating discussion of that case, which has application here, said:

"In United States v. McRae it filed a bill in the Court of Chancery in England to obtain an account of all moneys and goods which came to the hands of the defendant, as agent or otherwise, on behalf of the Confederate government during the insurrection, and the payment of the moneys which, on taking such account, might be in his hands, and a delivery over of the goods in his possession. The bill alleged that the Confederate government possessed itself of divers moneys, goods, and treasure, part of the public property of the United States, and that other moneys and goods were from time to time paid and contributed to it by divers persons, inhabitants of the United States, or were seized and acquired by that government in the exercise of its usurped authority; that it had sent to agents and other persons in England large amounts of money to be laid out in purchasing goods for its use, and had sent there large quantities of goods to be sold; that it had thus sent large sums of money and large quantities of goods to the defendant, and that on the dissolution of that government he had them in his possession. And the bill claimed that all the joint or public property of the persons constituting the Confederate government, including the said moneys and goods, had vested in the United States and constituted their absolute property, and ought to be paid and delivered to them. *The court held that the moneys, goods and treasure which were at the outbreak of the rebellion the public property of the United States, and which were seized by the rebels, still continued the moneys, goods, and treasure of the United States, their rights of property and rights of possession being in no wise divested or defeated by the wrongful seizure.* But that with respect to property which had been voluntarily contributed to or acquired by the insurrectionary government, and impressed in its hands with the character of public property, the right of the United States was that of a successor of the Confederate government; and that they could recover such property from an agent of that government, but subject, however, to the same rights and obligations,

to which that government would have been subjected, had it not been overthrown." (*Italics ours.*)   8 Law Repts., Equity, 69.

It is noted that the Court of Chancery of England held that the moneys, goods and treasure which were at the outbreak of the war the public property of the United States, and which were seized by the Confederate government, still continued to be the property of the United States, and that no title passed by the wrongful seizure.

Assuming that the government of the Confederate States was a government de facto, yet it never became a government de jure, and its acts of seizure were void in so far as divesting title from the owner of property seized.   Stevens v. Griffith, 111 U. S., 48, 28 L. Ed., 348.

Defendants in error cite Underhill v. Hernandez, by the Supreme Court of the United States, 168 U. S., 250, 42 L. Ed., 246, in support of their contention that the acts of Villa and his agents must be accorded the respect given to acts of a foreign government.   The facts of that case and the holding of the Supreme Court are concisely summed up in the syllabus as follows:

"Hernandez was in command of a revolutionary army in Venezuela when an engagement took place with the government forces which resulted in the defeat of the latter, and the occupation of Bolivar by the former.   Underhill was living in Bolivar, where he had constructed a waterworks system for the city under a contract with the government, and carried on a machinery repair business.   He applied for a passport to leave the city, which was refused by Hernandez with a view to coerce him to operate his waterworks and his repair works for the benefit of the community and the revolutionary forces.   Subsequently a passport was given him.   The revolutionary government under which Hernandez was acting was recognized by the United States as the legitimate government of Venezuela.   Subsequently Underhill sued Hernandez in the Circuit Court for the Second Circuit to recover damages caused by the refusal to grant the passport, for alleged confinement of him to his own house, and for alleged assaults and affronts of Hernandez's soldiers.   Judgment being rendered for defendant, the case was taken to the Circuit Court of Appeals, where the judgment was affirmed, the court holding 'that the acts of the defendant were the acts of Venezuela, and as such are not properly the subject of adjudication in the courts of another government.'   *Held,* that the Court of Appeals was justified in that conclusion.

"Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will

not sit in judgment on the acts of the government of another done within its own territory."

The concluding paragraph states the principle we have adopted, and is applicable to and controls our holding in the cases of Terrazas v. Holmes et al. and Terrazas v. Donohue et al., in which opinions are delivered today, for the reason that in those cases the Carranza government was successful and was recognized by the political department of our government both as a de facto and a de jure government. But it was otherwise in this case, as the Villa faction wholly failed and was never recognized as the legitimate government of Mexico.

The cases relied on by defendants in error to support the authority of Villa and his agents to seize private property, and that the acts of seizure passed the title to the property, are cases in which, we think, in every instance, the power was exercised by a de jure government, or by a de facto government which became a de jure government, or the acts were held to be authorized by a de jure government.

Such cases as appear not to follow the strict application of the rule announced have been those controlled by contracts and the effect to be given to the proper interpretation of the obligations of the parties. Mauran v. Insurance Co., 6 Wallace, 1, 18 L. Ed., 836; Thorington v. Smith, 8 Wallace, 1, 19 L. Ed., 361.

Plaintiff in error, the original or legal owner of the property, invokes the principle laid down by the Supreme Court of the United States, opinion by Mr. Chief Justice Taney, in the case of Mitchell v. Harmony, 13 Howard, 115, 14 L. Ed., 75, wherein it held that private property may be taken by a military commander to prevent it from falling into the hands of the enemy or for the purpose of converting it to the use of the public, *only* under imminent and impending danger and under urgent necessity such as will not admit of delay and not for use in future operations. That case grew out of operations in the war against Mexico in 1848. The Supreme Court held that property, of a citizen of the United States could not be taken by a military officer of the United States even for use of the public, unless the conditions described above existed, and then compensation must be made by the government. It held that the taking and subsequent destruction of private property under the circumstances was wrongful, and the military commander was personally liable to the owner for its value. This statement of the law has been quoted with approval in a number of cases by the Supreme Court of the United States and by other authorities. Dow v. Johnson, 100 U. S., 169, 15 L. Ed., 632; 40 Cyc., 319; 16 Am. & Eng. Enc.

of Law, 1154. In their argument in this court defendants in error said:

"It is not the contention of defendants in error that the property was seized as a military necessity, it being our contention that it was seized by a government and by a paramount force in the control of the territory at the time when it was taken. * * * *

"Our contention was and now is that the ore, being seized by a government, no matter how it existed or how it was conducted, was in control of the territory, the seizure was legal and could not be attacked and the legality of the seizure could not be questioned in any foreign court; also that the ore was seized by a paramount force in control of the territory. This would also pass the title."

It does appear that the acts of the agents of Villa are attributable to the Villa government and were done under its authority. We base our decision upon the holding that the acts of Villa and his agents were not the acts of a foreign government that the courts will respect, and being wrongful, no title passed to the purchaser.

We do not subscribe to the principle as announced and applied by the Court of Errors & Appeals of New Jersey in O'Neill v. Central Leather Co., 87 N. J. L., 552, 94 Atl., 789, L. R. A., 1917 A, 276, that title can be passed to private property seized by a military commander "exercising paramount force;" that the right to confiscate property "is one of the rights of the military occupant of a country." This is entirely too broad, and makes lawlessness and banditry too easy and leaves the right of property with too little or no safeguards or protection. Undoubtedly the weight of authority, and almost all authority, is to the contrary. The great law writers and jurists do not ascribe such dignity or recognition to mere paramount force. There must be something more. Paramount force must make good its right to rule, and some legitimate governmental authority must back its acts and be responsible for them. . After paramount force fails, no responsibility can be placed for its acts. Where property is destroyed or taken and used under the emergencies and necessities of a belligerent in action in legitimate warfare, personal liability may not attach against the military officer taking, using, or destroying it; but certainly afterwards, if the property exists and its identity is fixed, no title has passed, but remains in the legal owner.

The United States, a sovereign nation, a de jure government, did not recognize the untrammeled power or right of a com-

mander in the field to seize private property. If it was seized without justification, the commander was held personally liable. And when seized under necessity and under the rules of lawful warfare, the government made compensation to the owner, and for that purpose a Court of Claims was provided.

A paramount force in control of a territory that fails, leaves nothing behind. Its contracts are void, it has no power or ability to compensate for property taken, and its acts of seizure as far as passing title to property seized and sold are also nullities and can not pass title. There being no legitimate government, and none having existed, whose acts must be respected as the acts of a legitimate government, there is no legal reason why the owner's legal title should not be respected.

The judgment of the Court of Civil Appeals is affirmed in so far as it reversed the judgment of the District Court for the errors set out in its opinion, and the cause is remanded to the District Court for new trial in conformity with this opinion.

Judgment of reversal affirmed and cause remanded with instructions.    *Reversed and remanded.*